UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                               Case No. 02-23134-608

MONAHAN FORD CORPORATION OF FLUSHING,                                Chapter 7


                              Debtor
-----------------------------------------------------------------x
ALAN NISSELSON, ESQ., as Chapter 7 Co-Trustee of
MONAHAN FORD CORPORATION OF FLUSHING,
                              Plaintiffs,


              - against -                                            Adv. Pro. No. 04-01500-608


FORD MOTOR COMPANY, FORD MOTOR
COMPANY, GEORGE PAPANTONIOU a/k/a/
GEORGE PAPPAS, KAY PAPANTONIOU, GADI
BEN-HAMO, NATIONAL STAR EXECUTIVE
SALES, LLC, JOSSEF KAHLON, SAMUEL
GOLDSTEIN & CO., P.C., STUART GOLDSTEIN
and STEVE LEON,

                              Defendants.
-----------------------------------------------------------------x


                              <u>DECISION</u>


APPEARANCES:


Regina Griffin                            Byron L. Friedman
Howard L. Simon                           Wilson Elser Moskowitz Edelman & Dicker
Brauner Baron Rosenzweig & Klein,LLP      3 Gannett Drive
61 Broadway                               White Plains, New York 10604
New York, New York 10006                  Attorneys for Ford Motor Credit Company
Attorneys for Plaintiff


Michael J. Levin                          Ronald S. Herzog
Barger & Wolen, LLP                       Snow Becker Krauss, P.C.
10 E. 40th Street                         605 Third Avenue
New York, New York 10106                  New York, New York 10158
Attorneys for Ford Motor Company          Attorneys for Goldstein and Goldstein & Co.


Jennifer Rubin
Sutherland, Asbil & Brennan, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
Attorneys for Ford Motor Company


                              CARLA E. CRAIG
                         United States Bankruptcy Judge

This matter comes before the court on the motions of defendants Ford Motor Company ("Ford"), Ford Motor Credit Company ("FMCC"), Samuel Goldstein & Co. and Stuart Goldstein to dismiss this adversary proceeding, which was commenced by Alan Nisselson, the co-trustee ("trustee") of Monahan Ford Corporation of Flushing ("Monahan Ford" or "debtor").  The moving defendants argue that the trustee does not have standing to bring this action and that the trustee has failed to (1) state claims upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and (2) plead fraud with particularity pursuant to Fed. R. Civ. P. 9(b).

For the reasons set forth herein: (1) the trustee has standing to bring this action; (2) Ford and FMCC's motions to dismiss the fraud, aiding and abetting fraud, conspiracy to commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and deepening insolvency claims against them are denied; (3) Goldstein and Goldstein & Co.'s motion to dismiss the fraud, deepening insolvency and breach of fiduciary duty claims against them are denied; (4) Goldstein and Goldstein & Co.'s motions to dismiss the aiding and abetting fraud, conspiracy to commit fraud and aiding and abetting breach of fiduciary duty claims against them are granted; (5) Ford's motion to dismiss the fraudulent conveyance claim against it pursuant to Bankruptcy Code § 544 and New York's Debtor & Creditor Law § 276 is granted; (6) FMCC, Goldstein and Goldstein & Co.'s motions to dismiss the punitive damages claim is granted; (7) FMCC's motion to dismiss the claims against it for an accounting, lender liability, violation of the  Franchised Motor Vehicle Dealer Act ("Dealer Act"), conspiracy to violate the Dealer Act, promissory estoppel, and violation of the Federal Automobile Dealer's Day in Court Act ("ADDCA") is granted; and (8) FMCC's motion to dismiss the conspiracy to violate the ADDCA and equitable subordination claims against it is denied.  The trustee is given leave to replead all of the dismissed claims, with the exception of the punitive damages claim.

<u>Facts</u>

The following is a summary of the allegations of the complaint which are relevant to this motion.

The debtor owned and operated a Ford franchise automobile dealership in Queens, New York. (Am. Complaint ("Complaint") ¶¶ 8, 23.)  From October 1997 until May 2001, Micaela Monahan was the president and sole shareholder of the debtor.  (Complaint ¶ 23.)

In 2000, the debtor started to experience financial difficulties and its bank terminated the floor plan line of credit that the debtor used to purchase its inventory of Ford automobiles. (Complaint ¶ 24.)  At the same time, Ford was suffering from a 45% drop in profits and was under pressure to rid itself of excess vehicles that it was unable to sell by moving them from Ford's inventory to dealers.  (Complaint ¶ 25.)  Ford and FMCC viewed the debtor, in light of the debtor's financial troubles, as a dealership they could "take over and use for their own purposes" by selecting a dealer-principal over whom they could exercise complete dominion and control.  Ford would then be able to appear to increase its sales by "dumping" excess vehicles on the debtor.  (Complaint ¶ 26.)

Ford knew that George Pappas, a dealer-principal from another Ford dealership who did not have the capital to run his own dealership, was the perfect dealer-principal to place at the debtor, because he was someone whom Ford could control and coerce into accepting excess vehicle inventories.  (Complaint ¶ 28-29.)  Therefore, sometime in February or March, 2001, three Ford representatives, including  Bill Clampett and Robert Smythe, and Ford Credit representatives, including Bruce Epstein, met with Pappas, Artie LoFrese (a co-manager with Pappas of another Ford dealership) and Gadi Ben-Hamo (who would provide funding to Pappas). (Complaint ¶ 30.)  Ford made it clear at the meeting that Ford needed to dramatically increase the number of vehicles Ford moved to Monahan Ford, and that Pappas would have to acquire

about 2,000 new vehicles from Ford per year if Pappas wanted to be awarded the franchise and dealership. Ford's representative, Clampett, demanded that Pappas agree to this "forecast" which would require the debtor to accept substantially more vehicles from Ford than the debtor had been selling and more than could have been expected of any reasonable dealership in the Northeast region, given the economic climate and Ford's product lines at the time. (Complaint ¶¶ 31, 33-34.) Ultimately, Pappas agreed to accept Ford's demand to increase the Monahan Ford inventory, although he and Ford were aware that the debtor could not sell or finance 2,000 new cars per year under the circumstances existing at the time. (Complaint ¶ 35.)

At the meeting, Pappas' lack of capital was discussed. The parties were aware that Pappas was so undercapitalized that he did not possess the funds necessary to acquire a controlling interest in Monahan Ford. Ben-Hamo agreed to loan Pappas the funds to enable him to buy the debtor's controlling shares, in exchange for an agreement that Ben-Hamo and his company, National Star Executive Sales ("National"), would become partners and/or joint venturers in all of the debtor's used car operations. (Complaint ¶ 36.) FMCC agreed to provide the debtor and/or Ben Hamo with a $1,000,000.00 used car credit line to further induce Ben-Hamo's loan to Pappas. Id.

At the meeting, the parties also discussed how, given Pappas's lack of financial wherewithal, they could make it appear that Monahan Ford, with Pappas as its dealer-principal, could meet Ford and FMCC's minium working capital requirements for the award of the franchise and the multimillion dollar line of credit that FMCC was going to have to extend to the dealership to finance the excess inventories Ford intended to sell to it. (Complaint ¶ 37.) Smythe and Epstein outlined for Pappas what the financials of Pappas and Monahan Ford would

have to look like in order to appear that they met Ford and FMCC's respective criteria.   Among other things, they explained to Pappas that he and Ben Hamo would have to raise 30% of capital, approximately $1,000,000.00 in order to make it appear that Pappas and Monahan Ford met Ford and FMCC's criteria.  (Complaint ¶ 38.)  At the same time, Ford and FMCC knew that Pappas did not have adequate working capital to meet their requirements, and that he was already operating a different Ford dealership "SOT," or "out of trust," which means selling cars without paying the inventory financing on the vehicles.  (Complaint ¶¶ 39, 78.)

In this way, an agreement was reached among representatives of Ford, FMCC, Pappas and Ben Hamo to exploit the debtor for their own purposes, and to artificially extend the existence of the financially troubled dealership.  (Complaint ¶ 40.)

In order to accomplish this, Ford coerced Micaela Monahan, President and sole shareholder of Monahan Ford, into agreeing to sell her controlling shares in Monahan Ford to Pappas, although Ford knew that Micaela Monahan did not want to do business with Pappas based on previous dealings with him.  (Complaint ¶ 42.)  To accomplish this, Ford sent a franchise termination notice in early 2001 and presented the choice of either losing the dealership or selling the dealership or its controlling share to a dealer-principal whom Ford approved.  (Complaint ¶ 27.)  Ford then made it clear that Pappas was the only dealer-principal whom Ford would approve.  In this way Ford coerced Micaela Monahan to sell her shares to Pappas and to accept him as a new dealer principal.  (Complaint ¶¶ 42-43.)  Micaela Monahan sold 51% of the debtor's shares to Pappas in May 2001.  Pappas used funds loaned to him by Ben Hamo to pay the $400,000 purchase price.  (Complaint ¶ 46.)

In furtherance of this scheme, Pappas employed Goldstein & Co. and Goldstein to assist him in falsifying the debtor's financial documents, as well as his own financial statements, multiple times to appear as though they met the working capital and other financial requirements of Ford and FMCC. (Complaint ¶ 48.)  In early May 2001, with the guidance of representatives of Ford and FMCC, Goldstein and Goldstein & Co. falsified the financial statements of Pappas and Monahan Ford to be submitted to Ford and FMCC for the franchise application and the floor plan credit facility application.  On or about May 3, 2001, Pappas, Goldstein, and Goldstein & Co. prepared and submitted to Ford and FMCC a forecasted balance sheet for Monahan Ford as of May 15, 2001, which reflected total current assets of $9,129,677 and showed no retained earnings, but instead an accumulated deficit of $493,982.  This forecasted balance sheet was part of an accountants' compilation report prepared by Goldstein and Goldstein & Co. on behalf of Monahan Ford.  (Complaint ¶ 50.)

Upon information and belief, on May 3 and May 4, 2001, Ford and/or FMCC's representatives advised Pappas, Goldstein and Goldstein & Co. that financials in this form would not satisfy Ford's and FMCC's criteria, and provided guidance to them on how to falsely revise the financials so that Monahan Ford would appear to meet Ford's dealer-principal criteria and FMCC's lending criteria.  (Complaint ¶¶ 51-52.)  On May 4, 2001, Pappas, Goldstein, and Goldstein & Co. submitted to Ford and/or FMCC a fraudulently revised forecasted balance sheet, which showed increased total current assets of $6,215,000, showed no accumulated deficit, and instead showed retained earnings of $792,100.  The auditor's compilation report was also revised to show a $500,000 subordinated loan to be made by Pappas, as well as a $700,000 long-term capital loan to be made by FMCC.  (Complaint ¶¶ 53-55.)  In addition, Pappas, Goldstein and Goldstein & Co. falsified Pappas' personal financial statement dated April 30,

2001, which was submitted to Ford and FMCC on May 3, 2001, by falsely representing that Pappas had $850,000 in cash and no indebtedness to Ben Hamo.  (Complaint ¶ 56.)

Ford and FMCC did not verify the accuracy of the financial data, nor did they request information to support the financial statements of Pappas and Monahan Ford, such as bank statements, title reports, or sworn statements, in violation of their standard operating procedures. This was so even though, upon information and belief, Ford and FMCC's standard operating procedures require heightened verification procedures for applicants' financial statements where the dealer-principal seeks a working capital loan as well as a revolving line of credit. (Complaint ¶¶ 57-58, 60.)  Ford and FMCC knew that Pappas did not have sufficient cash to acquire his interest in Monahan Ford, and knew or should have known that Pappas's personal financial statement overvalued his interest in La Fres Ford, a dealership which was also a Ford franchise, and of which Pappas was a dealer-principal.  Ford and FMCC also disregarded their procedures by failing to verify Pappas' and Monahan Ford's financial statements when they knew or had reason to know that La Fres Ford had been selling vehicles out of trust throughout 2001. (Complaint ¶ 60.)

After Ford approved Pappas' application to become a dealer-principal, and FMCC approved the application for a $5.4 million floor plan lending facility, Ford began to "dump" a substantial number of vehicles on the debtor.  Within a few months, the debtor's inventory nearly tripled, and included an unusually large proportion of unpopular or year-old models, which are difficult to sell.  Ford dictated the volume and type of vehicles acquired by the debtor. (Complaint ¶¶ 63-67.)  To enable the debtor to finance this inventory acquisition, FMCC extended its floor plan lending facility, and, upon information and belief, expanded it to $12

million, in violation of its lending criteria.  (Complaint ¶ 68.)  Throughout this period, Pappas,

Goldstein and Goldstein & Co. submitted falsified monthly factory financial statements to

maintain the false appearance that the debtor met FMCC's lending criteria, and Ford and FMCC

deliberately failed to verify these statements in violation of their own standard operating

procedures.  (Complaint ¶¶ 69-70.)  At the same time, Ford was selling large numbers of Ford

taxis to LaFres Taxi, which was not a franchised Ford dealer, even though the Sales and Service

Agreement between the debtor and Ford required Ford to sell Ford products only to Ford

franchise dealers.  (Complaint ¶ 71.)

       In addition to allowing Ford and FMCC to exploit the debtor for their own purposes,

Pappas also used the debtor for his personal benefit by using the debtor's assets to pay off a

personal residence mortgage and his children's private school tuition.  (Complaint ¶¶ 72-73.)

Pappas hired his wife to perform bookkeeping for the debtor and paid her a higher salary than

was warranted for the services performed. (Complaint ¶ 74.)

       Pappas also caused the debtor to become delinquent in federal and state withholding tax

obligations, and caused the debtor to satisfy his personal obligation to his former partner in La

Fres Taxi, Arthur Lo Fres, by causing the debtor to enter into a fictitious purported consulting

agreement with Mr. Lo Fres whereby the debtor became obligated to pay Mr. Lo Fres $2,500 per

week for life, and to make such payments to his wife upon his death. (Complaint ¶¶ 75-76.)

Pappas also started to sell vehicles out of trust, or "SOT," a situation FMCC failed to detect even

though its operating procedures requires periodic audits.  (Complaint ¶¶ 80-87.)  The value of

inventory sold out of trust by the debtor reached $3 million.  FMCC failed to stop this practice,

although FMCC's standard operating procedures required periodic inventory audits.  (Complaint ¶¶ 77-87.)

In September 2002, a monthly financial statement was submitted by the debtor to Ford reflecting a $2.5 million decrease in net cash from the prior month. (Complaint ¶ 98.)  Upon seeing this statement, FMCC conducted another audit of the debtor and purported to discover that the debtor was more than $2.042 million "SOT."  FMCC immediately suspended lending facilities to the debtor, which triggered the debtor's chapter 11 filing on October 17, 2004. (Complaint ¶¶ 99-101.)  After the debtor's bankruptcy filing, FMCC installed Steve Leon, who represented to the debtor's employees that he was a Ford representative, to operate the debtor post petition. (Complaint ¶¶ 104-105.)  Ford and FMCC directed Steve Leon to operate the debtor for their benefit and to pay any funds received by the debtor to FMCC instead of to the taxing authorities or the debtor's employees.  (Complaint ¶ 106.)

During the post-petition period, the debtor met the requirements to qualify for Ford's Blue Oval Certification, which would entitle it to certain post-petition incentive payments from Ford, which have not been paid.  (Complaint ¶ 108.)  Ford also did not pay the debtor post petition monies owed to the debtor for holdbacks including part sales, refunds and returns, and warranty work that the debtor performed. (Complaint ¶ 109.)

In addition, the Complaint alleges that avoidable pre-petition transfers were made to certain defendants, including $319,639.93 paid to Ford.  The transfers are identified on a chart by date, amount, and check number, but no other facts, such as the purpose or circumstances of the transfers, are pled.  (Complaint ¶¶ 223-225, 256-258.)

<u>Legal Standards</u>

Defendants' motions to dismiss are governed by Federal Rules of Civil

Procedure 12(b)(6) and 9(b), made applicable in bankruptcy proceedings by Federal Rules of

Bankruptcy Procedure 7012 and 7009, respectively.  If a complaint fails to meet the

requirements of those rules, the court should freely grant leave to replead "when justice so

requires." Fed. R. Civ. P. 15(a) (2005); <u>See also</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct.

227, 230, 9 L. Ed. 2d 222 (1962)(generally, permission to amend should be freely granted).

Indeed, when a plaintiff specifically requests leave to amend, as here, the failure to grant leave to

amend is an abuse of discretion unless the plaintiff acted in bad faith or the amendment would be

futile. <u>Caputo v. Pfizer, Inc.</u>, 267 F.3d 181, 191 (2d. Cir. 2001).

<u>I.  Rule 12(b)(6)</u>

A complaint should not be dismissed under Federal Rules of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

<u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed 2d 80 (1957).  The court "must

accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from

those allegations in the light most favorable to plaintiff, and construe the complaint liberally"

when determining the complaint's sufficiency. <u>Gregory v. Daly</u>, 243 F.3d 687, 691 (2d Cir.

2001)(citing <u>Tarshis v. Riese Org.</u>, 211 F.3d 30, 35 (2d Cir. 2000)).

The court's consideration is limited to the assertions made within the four corners of the

complaint, to documents attached to the complaint as exhibits or incorporated in it by reference,

to matters of which judicial notice may be taken, or to documents either in the plaintiff's

possession or of which the plaintiff had knowledge and relied on in bringing suit.  Brass v. Am.
Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993).  "In short, '[t]he function of a motion to
dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the
evidence which might be offered in support thereof.'"  Amalgamated Bank of N.Y. v. Marsh,
823 F. Supp. 209, 215 (S.D.N.Y. 1993) (quoting Ryder Energy Distribution Corp. v. Merrill
Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)).

## II. Rule 9(b)

Federal Rule of Civil Procedure 9(b) mandates that allegations of fraud, and all claims
sounding in fraud, should be pled with particularity. Fed. R. Civ. P. 9(b)(2005); Granite Partners,
L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 285 (S.D.N.Y. 1998); Frota v. Prudential-
Bache Sec. Inc., 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments
of fraud or mistake, whatever may be the theory of legal duty–statutory, common law, tort,
contractual or fiduciary.").  "When reviewing the complaint, however, Rule 9(b) must be
reconciled with Rule 8 of the Federal Rules of Civil Procedure which provides that the complaint
should contain only 'a short and plain statement of the claim,' and with the consequence that
Rule 9(b) does not require the pleading of detailed evidence." Kravetz v. Brukenfeld, 591 F.
Supp. 1383, 1386 (S.D.N.Y. 1984).

The Second Circuit has held that a plaintiff must (1) detail the statements that are alleged
to be fraudulent, (2) identify the speaker, (3) state where and when the statements were made
and (4) explain why the statements were false. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124,
1127-1128 (2d Cir. 1994); Granite Partners, 17 F. Supp. 2d. at 286 ("The Court of Appeals has
required that allegations of fraud adequately specify the statements made that were false or

misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them.").  When the fraud allegation is in respect to an omission, as opposed to a misrepresentation, a plaintiff must plead the type of facts omitted, where the omitted facts should have been stated and the way in which the omitted facts made the representations misleading. Fujisawa Pharm. Co. v. Kapoor, 814 F. Supp. 720, 727 (N.D. Ill. 1993); See also Solow v. Stone, 994 F. Supp. 173, 182 (S.D.N.Y. 1998)("9(b)'s heightened pleading requirement applies to claims of fraudulent concealment).  Conclusory allegations that states that a defendant's actions are fraudulent are insufficient. Pilarczyk v. Morrison Knudsen Corp., 965 F. Supp. 311, 321 (N.D.N.Y. 1997).  However, "where the transactions are numerous and take place over an extended period of time, less specificity is required." Coan v. Bell Atlantic Sys. Int'l Leasing, Inc., 813 F. Supp. 929, 948 (D. Conn. 1990)(citing Schnabel Assocs., Inc. v. Conn. Hous. Auth., Civ. No. H88-541, at 3(D. Conn. Nov. 15, 1989)).

Courts generally evaluate averments of fraud in the bankruptcy context more liberally than in other civil actions charging fraud. Harrisson III v. Entm't Equities, Inc. (In re Rave Communications, Inc.), 138 B.R. 390, 396 (Bankr. S.D.N.Y. 1992)(citing Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 498 (N.D.Ill. 1988)).  However, "the pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits." Granite Partners, 17 F. Supp. 2d. at 285-286.  Notice is not sufficiently given when a claim relies on blanket references to acts or omissions by multiple defendants because each defendant is entitled to be notified of the fraudulent conduct with which he is individually charged. Id. at 286.

<u>Discussion</u>

I.  Standing

Defendants assert that the trustee lacks standing to bring this action under the rule articulated in <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114 (2d Cir. 1991).  Under the <u>Wagoner</u> rule, a trustee lacks standing to seek recovery against third parties on behalf of a corporate debtor for defrauding the corporation with the cooperation of debtor's management.  According to defendants, the <u>Wagoner</u> rule is applicable in this action because Pappas, acting as the debtor's management, is alleged to have participated in the wrongdoing for which the trustee is seeking to recover.  Defendants further argue that even if Pappas was acting adversely to the debtor's interests, the trustee may not invoke the adverse interest exception to this rule, because Pappas was the only relevant decisionmaker at Monahan Ford.

The trustee contends that the <u>Wagoner</u> rule does not apply because Pappas was acting as the agent of one or more of the defendants, not as debtor's management, in connection with the alleged wrongdoing.  Moreover, the trustee contends, Pappas was not the sole actor at Monahan Ford, because Micaela Monahan was an innocent shareholder who could have put an end to the wrongdoing had she known it was being committed.

 Standing "is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court."  <u>Wagoner</u>, 944 F.2d at 117.  The party whose standing is challenged must have a "personal stake in the outcome of the controversy" in order to meet the case and controversy requirement of Article III of the Constitution.  <u>Breeden v. Kirkpatrick & Lockhart, LLP</u>, 268 B.R. 704, 708 (S.D.N.Y. 2001), <u>aff'd</u>, 336 F.3d 94 (2d Cir. 2003)(citing <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975));

Wagoner, 944 F.2d at 118.  A "party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties' to meet the prudential requirement of standing." Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.), 278 B.R. 28, 35 (Bankr. E.D.N.Y., 2002)(citing Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir. 2000)); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir. 1995); Wagoner, 944 F.2d at 118.

    "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." Wagoner, 944 F.2d at 118.  Generally, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Id. at 120.  Under the Wagoner rule, "a bankruptcy trustee lacks standing under New York law to seek recovery on behalf of a debtor company against third parties for injuries incurred by the misconduct of the debtor's controlling managers." Breeden, 268 B.R. at 709. "The rationale for the Wagoner rule is 'the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.'" Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F.3d 94, 100 (2d Cir. 2003) (citing Wight, 219 F.3d at 86.)  Therefore, since the trustee stands in the shoes of the debtor, it follows that the trustee is barred from suing to recover for a wrong in which the corporation took part. Sharp, 278 B.R. at 36 (citing Wight, 219 F.3d at 86).

    However, the Wagoner rule will not be invoked when the adverse interest exception applies. Id.  This means that management misconduct will not be imputed to the corporation if the management, although purportedly acting for the corporation, was "really committing a fraud

for his own benefit." <u>Bennett</u>, 336 F.3d at 100 (quoting <u>Wight</u>, 219 F.3d at 87).  "The theory is 'that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it'." <u>Wight</u>, 219 F.3d at 87 (quoting <u>Munroe v. Harriman</u>, 85 F.2d 493, 495 (2d Cir. 1936)).  This adverse interest exception applies "only when the agent has 'totally abandoned' the principal's interests." <u>In re Mediators, Inc.</u>, 105 F.3d 822, 827 (2d Cir. 1997)(citing <u>Center v. Hampton Affiliates</u>, 66 N.Y.2d 782, 784-785 (1985)).

"The adverse interest exception is, in turn, subject to the sole actor rule, which, if applicable, invokes the <u>Wagoner</u> rule even if the management acted adversely to the interests of the corporation."  <u>Sharp</u>, 278 B.R. at 37.  "The sole actor rule applies 'where the principal and agent are one and the same,' and precludes the trustee from raising the adverse interest exception as a defense, because 'notwithstanding the agent's self-dealing . . . the party that should have been informed was the agent itself albeit in its capacity as principal.'" <u>Id.</u> (citing <u>Mediators</u>, 105 F.3d at 827).  Imputation applies unless "at least one decision-maker in a management role or amongst the shareholders is innocent and could have stopped the fraud." <u>Bennett</u>, 336 F.3d at 101; <u>Wechsler v. Sqaudron, Ellenoff, Plesent & Sheinfeld, LLP.</u>, 212 B.R. 34, 36 (S.D.N.Y. 1997)("[T]he Wagoner rule only applies where all relevant shareholders and/or decisionmakers are involved in the fraud. . . ")  Courts considering the applicability of the sole actor rule on a motion to dismiss have looked to the complaint to see whether the plaintiff has alleged that there was an innocent shareholder who could or would have prevented the fraud had he or she known about it. <u>Sharp</u>, 278 B.R. at 37.

Here, the trustee has standing to bring this action on behalf of the debtor.  The present allegations set forth a situation that is different than the fact pattern in which Wagoner is generally invoked, where an outsider, such as an accounting or law firm, is alleged to have assisted management in defrauding the corporation. See Bennett, 336 F.3d at 100.  For example, in Breeden v. Kirkpatrick & Lockhart, the court found that the trustee lacked standing to pursue claims for professional malpractice and breach of fiduciary duty against the company's law firm and accountants, where the fraud was perpetrated in the first instance by the company's CEO and controlling shareholder. Breeden, 268 B.R. 704.  Here, by contrast, the complaint alleges that Pappas, while purportedly acting as the manager of the debtor, in reality was an agent of Ford and FMCC and was put in control of the debtor by those parties specifically to control the debtor for their benefit.  The complaint does not allege that Pappas enlisted the help of the third parties to help him defraud the debtor; in fact, the reverse is alleged - that Ford and FMCC enlisted Pappas to assist them in their scheme to defraud Monahan Ford.  Indeed, the fraudulent scheme complained of was allegedly initiated before Pappas was a principal or manager of the debtor. (Complaint ¶¶ 26-40.)

Even if the Wagoner rule applies, the allegations of the complaint are sufficient to invoke the adverse interest exception.  It is alleged that throughout his tenure as a manager of the debtor, Pappas was acting either to benefit third parties (by enabling Ford to "dump" excess cars on the debtor to make Ford's sales statistics appear higher), for his own benefit (by using debtor funds to pay personal obligations), or but not for the corporation's benefit.  See Servs., Inc. v. Ernst & Young (In re CBI Holding Co.), 247 B.R. 341 (Bankr. S.D.N.Y. 2000) (finding that the manager was acting for his own benefit and not the corporation's).

Defendants' argument that the sole actor rule applies, defeating the application of the adverse interest exception, must be rejected, at least on a motion to dismiss. Although Pappas was the controlling shareholder and manager of Monahan Ford after he acquired a 51% interest in May, 2001, the complaint adequately alleges that an innocent shareholder existed who could have stopped the fraudulent scheme had she known it was being committed. (See Complaint ¶ 46.) It may readily be inferred that Micaela Monahan was not privy to the alleged scheme to use the debtor as a dumping ground for excess Ford vehicles, or aware of the fact that Pappas would be managing the debtor for Ford's benefit, or aware that Monahan Ford, with Pappas as a dealer-principal, did not meet Ford or FMCC's financial criteria. There is no allegation that suggests she was aware of any of those facts, and it is difficult to imagine why she would knowingly cooperate with a fraudulent scheme to destroy her own company. Micaela Monahan was a 48% shareholder and could have taken action (if necessary, by commencing litigation) to stop the fraud. See Sharp, 278 B.R. at 39 (a complaint alleging an innocent 13% shareholder was sufficient); CBI, 247 B.R. at 360 (48% shareholder was innocent and could have stopped the scheme had he known of it).

Comparison of the instant case with Breeden is instructive. First of all, Breeden was decided after a four-day evidentiary hearing on the issue of standing, at which the district court heard testimony, weighed the evidence and reached factual conclusions. This motion comes before the Court on a pre-answer motion to dismiss, and there has been no evidentiary hearing. In this context, the complaint must be construed liberally and inferences must be drawn in the light most favorable to plaintiff. Gregory,, 243 F.3d at 691. Furthermore, there are many distinctions between the facts found in Breeden and the allegations in this case.

Breeden involved "what at the time it was uncovered was characterized as the greatest Ponzi scheme on record," whereby Bennett Funding Group, Inc. ("BFG") sold and resold the same office equipment leases. Bennett, 336 F.3d at 97. BFG was a family run business in which Bud and Kathleen Bennett, a husband and wife, were the sole shareholders and their sons, Patrick and Michael, were CFO and CEO, respectively. Patrick Bennett was the architect of the Ponzi scheme and the district court found that the other Bennett family members were complicit in the scheme. Breeden, 268 B.R. at 710.

BFG's chapter 11 trustee sued the company's lawyers and accountants, alleging that they should have detected the fraud. Bennett, 336 F.3d at 96. BFG's bankruptcy trustee conceded that BFG was a family-run "dictatorship" and that Patrick Bennett had total control of the company's finances. Id. at 97. The BFG trustee asserted that presence of four innocent members on the BFG board of directors nevertheless defeated imputation of the fraud to the company under the Wagoner rule. The district court found otherwise, and the Court of Appeals affirmed.

Facts which persuaded the Court of Appeals that the presence of these innocent directors did not defeat the application of the Wagoner rule were that the directors were "hand picked" by the shareholders, and were BFG employees; that the Bennett family did not "tolerate any questioning that could have uncovered the fraud," and fired BFG's controller when he sought information concerning questionable transactions; that when BFG's auditors, Arthur Andersen, refused to issue a clean opinion in 1991, they were summarily fired without a mention to the Board; and that when the shareholders were confronted with clear evidence of fraud in 1995, they placed all of their BFG stock in a trust, the language of which insured that Patrick Bennett would be Chairman of the Board and CEO of BFG in perpetuity. Bennett, 336 F.3d at 98.

Based upon this, the Court of Appeals concluded that "each so-called independent director was impotent to actually do anything." Id. at 101. Clearly this was the case; the BFG directors were subject to removal or termination by Bud and Kathleen Bennett, BFG's sole shareholders, and had no authority except as given to them by the Bennett family.

Indeed, it is difficult to see what the BFG directors could, even theoretically, have done to stop the fraud. Informing the shareholders would have been useless, as the district court found that they were complicit in the fraud. Informing the company's auditors would have been equally futile; Patrick Bennett would simply have fired the auditors, as he did in 1991 when they refused to issue a clean opinion. Commencing legal action against BFG or the corrupt management would have been of dubious efficacy as well; the Bennetts, if they got wind of such a plan, could have fired them and removed them as directors, thereby depriving them of standing, just as they fired BFG's controller when he sought information they did not want to reveal. Perhaps one of the innocent directors could have informed the SEC about the fraud; but, as the district court found, none of them were able to testify that they would have would have done so, and in any event, "[i]t is unclear whether such insiders would have had the legal ability to approach third-parties with information about the Ponzi scheme." Breeden, 268 B.R. at 713.

The facts presented in this case are quite different. Pappas was not the sole shareholder of Monahan Ford. As a 48% shareholder, Micaela had standing to commence a derivative action or an action to enforce her rights under applicable law. N.Y. Bus. Corp. § 720 (Consol. 2004); Levine v. Chavkin, 369 N.Y.S.2d 588, 590 (1974). Unlike the Bennetts, Pappas did not have the power to get rid of Micaela Monahan. See Sharp Int'l Corp. v. KPMG LLP, 319 B.R. 782, 790 (Bankr. E.D.N.Y. 2005). At a minimum, these allegations are sufficient at the pleading stage to

allege "the presence of a person with the ability to bring an end to the fraudulent activity at issue."  See Breeden, 268 B.R. at 710.

The conclusion that the complaint contains allegations sufficient to withstand a motion to dismiss is also supported by Wight v. BankAmerica Corp., 219 F.3d 79 (2d Cir. 2000).  Plaintiffs in Wight were the liquidators of Bank of Credit and Commerce International ("BCCI"), which led a "short, swashbuckling life" before collapsing amid allegations of fraud. Id. at 81.  BCCI's liquidators sued one of BCCI's correspondent banks for aiding and abetting one of the managers' fraudulent schemes.  Defendants argued that the adverse interest exception did not operate to abrogate the Wagoner rule, because the complaint also alleged that the corporation was "dominated by corrupt prior senior managers and directors," which, they argued, invoked the sole actor rule. Id. at 87 (emphasis in original).  Noting that on a motion to dismiss, the complaint must be construed in the plaintiff's favor, the Second Circuit credited as true the plaintiffs' allegation that "BCCI was adversely dominated by corrupt [management], who act[ed] in their own interests and not in the interests of BCCI . . ." and found that this allegation precluded the dismissal of the complaint under Wagoner. Id.  In sustaining the sufficiency of the complaint, the court did not consider whether the liquidators of BCCI had pled facts showing the existence of an innocent member of management who would have prevented the fraud if it had been disclosed.  Thus, Wight stands for the proposition that on a motion to dismiss, an allegation of adverse interest should be credited as true, and that the "key 'question of whether the guilt of the corporate officers can be imputed to the corporation' " should be decided on an evidentiary record and not disposed of on the pleadings. Id.; See Sharp 278 B.R. at 38.

Therefore, the trustee has standing to bring this action.  This case is distinguishable from those in which the trustee's standing is barred by management's misconduct because Pappas is alleged to have been placed at the debtor by Ford and FMCC and to have acted as their agent. Moreover, even if the Wagoner rule does apply, the allegations of the complaint are adequate, at least at the pleading stage, to the invoke the adverse interest exception to that rule.

II. Claims

    A.  Fraud

Ford, FMCC, Goldstein and Goldstein & Co. argue that the complaint fails to plead the necessary elements of fraud with particularity.

To state a claim for fraud under New York law a plaintiff must plead that the defendant made a material false representation or omission of an existing fact, with knowledge of its falsity and an  intent to defraud the plaintiff (scienter), on which the plaintiff reasonably relied and suffered damages as a result of such reliance. Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 276 (2d Cir. 1992), overruled on other grounds, Gerosa v. Savasta & Co., 329 F.3d 317 (2d Cir.2003) .  When there are multiple defendants, the complaint must provide sufficient information alleging each defendant's individual participation in the fraudulent conduct. Granite Partners, 17 F. Supp.2d at 286.

    1.  Material False Representation/Omission

Rule 9(b) requires that the allegations of fraudulent misrepresentations and omissions give particulars as to the respect in which the statements were fraudulent and state the time and place the statements were made and the identity of the person who made them. Fed R. Civ. P. 9(b); Mclaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992); Cosmas v. Hassett, 886 F.2d. 8,

11 (2d Cir. 1989); <u>ABF Capital Mgmt. v. Askin Capital Mgmt. L.P.</u>, 957 F. Supp. 1308, 1318 (S.D.N.Y. 1997).  When the fraud allegation is in respect to an omission, as opposed to a misrepresentation, the plaintiff must plead the type of facts omitted, where the omitted facts should have been stated, and the way in which the omitted facts made the representations misleading.  <u>Fujisawa</u>, 814 F. Supp. at 727.

The complaint sufficiently alleges a material misrepresentation and omission with particularity against Ford.  It is alleged that Ford held out Monahan Ford, with Pappas as a dealer-principal, as meeting its criteria as franchisee, when it allegedly did not. (Complaint ¶ 115.)  The complaint alleges that this misrepresentation was made in early 2001, at the time that Ford allegedly coerced Micaela Monahan into selling 51% of her shares in the debtor to Pappas. Ford's alleged holding out of Pappas as meeting its criteria as a dealer-principal is a misrepresentation because Pappas was undercapitalized, and adequate capitalization of the dealer-principal is inferred to be one of Ford's criteria to approve a franchisee as a dealer principal.  Such a misrepresentation may readily be inferred to be material.  If the debtor had known Pappas's true financial condition, the debtor might have chosen to pursue other legal options rather than accept Pappas as a manager and principal.

The complaint does not state which Ford representative made the alleged misrepresentations to the debtor.  The trustee explains that any time the complaint refers to a statement made by Ford it should be interpreted that Ford's representatives are Clampett and Smythe. (Tr. Mem. in Opp'n to Ford's Mot. to Dismiss, at 29 n.10.)  Although additional facts or clarifications made in memoranda of law submitted by the trustee are not considered in determining whether the complaint pleads with sufficient particularity, <u>see</u> <u>Dietrich v. Bauer</u>, 76

F. Supp. 2d 312, 328 (S.D.N.Y. 1999)("Matters suggested in [the plaintiff's] opposing papers that interpret allegations in the Amended Complaint broadly or facts that are offered but to not appear in the Amended Complaint will not be considered.")(citing Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 178 (S.D.N.Y. 1996)), it can be inferred from the complaint that the individuals in question are Mesrrs. Clampett and Smythe, because they were the two Ford representatives who are alleged to have initiated and carried out the alleged fraudulent scheme to place Pappas at Monahan Ford to run the company for Ford's benefit.  (Complaint ¶¶ 28-30.) See Catton v. Def. Tech. Sys., Inc., No. 05-Civ. 6954, 2006 WL 27470, at *3 (S.D.N.Y. Jan. 3, 2006)(stating that, on a motion to dismiss, courts must "draw all reasonable inferences in plaintiff's favor.").  Ford's holding out of Pappas as meeting its criteria, whether viewed as misrepresentation that Pappas was capitalized, or an omission to reveal Pappas's undercapitalization, is sufficiently alleged as being fraudulent. See Minpeco, S.A. v. Conticommodity Servs., Inc., 552 F. Supp. 332, 336 (S.D.N.Y. 1982)("Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous.").

The complaint also sufficiently alleges a material fraudulent omission in Ford's omission to state its motive in approving Pappas and its omission to state that Pappas, while purportedly acting as Monahan Ford's manager, would in fact be working as Ford's agent, to accomplish Ford's goal of offloading excess vehicle inventories on Monahan Ford.  The complaint alleges that the disclosures should have been made "at all relevant times." (Complaint ¶ 25; Tr. Mem. in Opp'n to Ford's Mot. to Dismiss, at 29-30.)  This time period can be inferred to include, at a minimum, the time of the early 2001 conversation with the debtor wherein Ford allegedly coerced the debtor to accept Pappas as its dealer-principal, and thereafter when Pappas became a

dealer-principal.  Ford's omission to state its motive in proposing Pappas to be a dealer-principal of Monahan Ford, and to disclose that Pappas had agreed, as a condition to being approved as a dealer-principal, to accept excess vehicle inventories on behalf of Monahan Ford, is obviously material.

The complaint sufficiently pleads that FMCC made a material misrepresentation or failed to disclose material facts to the debtor.  Taking the allegations in the complaint as true and drawing all reasonable inferences in plaintiff's favor, the complaint alleges that FMCC omitted to inform the debtor that the proposed financing was being offered to the debtor as part of a scheme to control the operations of the debtor for Ford's benefit so that excess vehicle inventory could be moved.  In addition, the debtor's financial statements were allegedly falsified under FMCC's guidance to reflect that the debtor met FMCC's lending criteria.  These are material misstatements and omissions because had the true facts been disclosed, the debtor might have chosen not to accept Pappas as a dealer-principal and not to accept the financing from FMCC.

The allegations of misrepresentations and/or omissions against Goldstein and Goldstein & Co. suffice under Rule 9(b) as well.  The complaint alleges that Goldstein and Goldstein & Co. prepared falsified financial statements for the debtor.  (See Complaint ¶¶ 49, 53-6.)  The complaint alleges that on May 3, 2001, Goldstein and Goldstein & Co. prepared a financial statement for the debtor reflecting that it had total current assets of $4,129,677.00.  The complaint further alleges that Ford and FMCC told Goldstein and Goldstein & Co. that the statements did not meet their criteria, and that as a result, on May 4, 2001, Goldstein and Goldstein & Co. revised the debtor's financial statement to reflect total current assets of $6,215,000.00 and retained earnings of $792,100.00, and deleted the debtor's accumulated

deficit of $493,382.00.  It can be inferred from the complaint that the numbers on the May 4, 2001 statement were false, and that the debtor's assets did not increase in excess of $2,000,000.00 overnight.  These allegations of misrepresentations are sufficient because the date of the financial statements is specified and the manner in which they are fraudulent can be inferred.

The complaint sufficiently alleges the misrepresentations and omissions of Ford, FMCC, Goldstein and Goldstein & Co. and meets Rule 9(b)'s goals because the complaint gives each defendant notice of the individual allegations against them, the grounds on which they are based, and the ability to answer the complaint and prepare a defense.

## 2. Knowledge of Falsity and Scienter

Unlike actual fraud, which must be stated with particularity, "the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity." Wight, 219 F.3d at 91 (citing Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996)); See also ABF, 957 F. Supp. at 1318.  Rule 9(b) allows "conditions of mind" to be averred generally because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." Wight, 219 F.3d at 91-2 (citing Conn. Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987)); Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 494 (S.D.N.Y. 2001).  "In fact, conclusory allegations of scienter are sufficient 'if supported by facts giving rise to a 'strong inference' of fraudulent intent.'" ABF, 957 F. Supp. at 1318 (quoting IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993)).  Fraudulent intent may be inferred from allegations of a motive to commit the fraud and a clear opportunity for doing so or from circumstances indicating conscious or reckless misbehavior by the defendants. Id.  "Motive is properly alleged by stating

concrete benefits that could be realized by one or more of the false statements. Opportunity requires demonstrating the means and likely prospect of achieving those means through the fraudulent statements." In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001)(internal citations and quotation marks omitted).  Conscious misbehavior "encompasses deliberate illegal behavior." In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 471 (S.D.N.Y. 2004).  Reckless misbehavior is "at least, conduct which is 'highly unreasonable' and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rieger v. Drabinsy (In re Livent, Inc. Noteholders Sec. Litig.), 151 F. Supp. 2d 371, 411 (S.D.N.Y. 2001).

Furthermore, allegations that a defendant acted with reckless disregard to the truth of a statement satisfy the pleading requirement of knowledge. Diduck, 974 F.2d at 276. "While the fact that a representation is false does not itself support an inference of knowledge of falsity, the defendant's situation or 'continuity of conduct' may." Id.

### a. Ford

The complaint sufficiently alleges fraudulent intent on the part of Ford.  In 2001, Ford had suffered a 45% drop in profits and needed to move excess vehicles to make it appear as if the sales were increasing. (Complaint ¶ 25.)  This constitutes motive.  Ford also is alleged to have had the opportunity to achieve its motive by placing a dealer-principal it could dominate and control at Monahan Ford.  (Complaint ¶¶ 43-44.)  Ford's alleged knowledge of Pappas's undercapitalization, and of the falsity of the representation that Pappas met its dealer-principal criteria, is also a sufficient pleading of scienter.  In addition, the complaint alleges reckless

conduct on Ford's part in failing to verify Pappas's financial statements when approving him as dealer-principal of the debtor. (See Complaint ¶¶ 58-60.)

Ford argues that the Trustee's theory of Ford's fraudulent intent is irrational, and therefore inadequate as a matter of law. Ford characterizes the Trustee's theory as follows: "(1) Ford desired to sell some additional cars to one particular dealer because it wanted higher profits, so (2) Ford arranged for an undercapitalized dealer to purchase additional units that could not be resold, inevitably (3) forcing its wholly owned subsidiary Ford Credit to absorb over $8 million in losses." (Reply Memorandum of Ford Motor Company, p. 13.)

This is both an oversimplification and a distortion of the allegations of the Complaint. The scenario described in the Complaint is one in which Ford was under pressure to show an increase in profitability due to a recent 45% drop in profits. For this reason, it selected a dealer-manager for Monahan Ford to whom Ford could dictate the volume and type of vehicles to be acquired by the dealership, and proceeded in this way to offload excess inventory on Monahan Ford. Ford would be paid for these vehicles; so from that standpoint, the transaction was not irrational. Nor was the transaction necessarily irrational from the standpoint of the impact on its subsidiary, FMCC. Losses to FMCC (or at least substantial losses) were not necessarily inevitable, even if the vehicles were not sold by Monahan Ford. FMCC was secured by the vehicles it was financing, and would have been protected to that extent by its security interest if Pappas had not sold vehicles out of trust. In that event, the risk of this transaction would have been borne primarily by Monahan Ford, whose capital was at stake.

Moreover, it is not necessarily irrational for a parent company (such as Ford) to decide to take a risk of incurring some future loss in a subsidiary in order to show immediate increased

profits at the parent level.  This is the type of calculated risk that businesses often take.  For

Monahan Ford, however, the risk was greater, and was not calculated; it was thrust upon

Monahan Ford without its knowledge or consent (according to the complaint).

> b.  FMCC

An argument may be made that FMCC's knowledge of falsity and scienter has not been

adequately pled because FMCC's conduct in participating in the alleged fraudulent scheme

would not result in FMCC's economic benefit.  See Atl. Gypsum Co., Inc. v. Lloyds Int'l Corp.,

753 F. Supp. 505, 514 (S.D.N.Y. 1990) (finding no fraudulent intent where "on plaintiffs' view

of the facts, defendants advanced money to the venture with the intention of driving it into the

ground so that they could control the failed venture and then wait in line with other creditors in a

bankruptcy proceeding.").  However, as the Supreme Court stated:

> [A] parent and its wholly owned subsidiary have a complete unity
> of interest.  Their objections are common, not disparate; their
> general corporate actions are guided or determined not by two
> separate corporate consciousnesses, but one. . . .With or without a
> formal "agreement" the subsidiary acts for the benefit of the
> parents, its sole shareholders . . . [and] the parent may assert full
> control at any moment if the subsidiary fails to act in the parent's
> best interest.

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771-2, 104 S. Ct. 2731, 81 L. Ed.

2d 628 (1984)(discussing whether a corporation and its wholly owned subsidiary can enter into a

conspiracy for purposes of § 1 of the Sherman Act.)

The complaint sufficiently alleges fraudulent intent on the part of FMCC.  The trustee

argues that FMCC is "the wholly owned subsidiary and lending arm of Ford, whose primary

business is to aid Ford in the distribution of its vehicles by, among other things, financing

dealers' purchases of vehicles from Ford." (Tr. Mem. in Opp'n to FMCC's Mot. to Dismiss, at

6.) FMCC's alleged motive was to aid its parent corporation to falsely inflate its parent company's sales numbers by helping it move excess vehicles. Nor was FMCC's alleged participation in this scheme entirely irrational, even from the standpoint of its own economic benefit. FMCC's loan to the debtor was secured by the financed Ford vehicles, and FMCC could potentially have benefitted economically, or at least broken even, if Pappas had not sold vehicles out of trust.

Even if the motive and opportunity of FMCC is insufficiently alleged, scienter can be pled through allegations that FMCC recklessly disregarded its operating procedures before awarding the lending facility to the debtor, and in subsequently increasing the facility. The complaint alleges with sufficient particularity that Ford Credit extended the lending facility to the debtor without verifying the debtor's or Pappas's financial statements or reviewing bank statements or title reports. (Complaint ¶ 58.)

C. Goldstein Defendants

The complaint does not allege facts from which it could be inferred that Goldstein or Goldstein & Co. would have a motive to defraud the debtor except for the incentive to receive fees. This motive is insufficient for scienter purposes under Rule 9(b). See Complete Mgmt., 153 F. Supp. 2d at 335 (finding that an inference of scienter is not supported by the fact that the accountant was paid to perform services); see also ICD Holdings S.A. v. Frankel, 976 F. Supp. 234, 245 n.51 (S.D.N.Y. 1997)("Many federal courts have held that the fact that professional service firms . . . receive fees for their services is insufficient to supply the motive essential to the motive-and-opportunity theory under Rule 9(b).").

However, the complaint does plead with particularity facts amounting to circumstantial evidence of Goldstein and Goldstein & Co.'s recklessness. "[A] pleading of "conscious misbehavior" or recklessness by an accountant must meet a demanding pleading standard." Complete Mgmt., 153 F. Supp. 2d at 333. To meet this standard, a plaintiff must plead that an accountant's alleged conduct departed in an extreme way from the standards of ordinary care and approximated an actual intent to aid in the fraud being perpetrated. Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)(citing Deck v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-121 (2d Cir. 1982)). Allegations of an egregious refusal to see the obvious or investigate the doubtful can reasonably support an inference that the accountant acted with intent. Complete Mgmt., 153 F. Supp. 2d at 334 (citing In re the Leslie Fay Cos. Inc., Sec. Litig., 871 F. Supp. 686, 699 (S.D.N.Y. 1995)).

Here, the complaint alleges with particularity that Goldstein and Goldstein & Co. prepared a financial statement on May 3, 2001 reflecting that the debtor had total current assets of $4,129,677.00 and an accumulated deficit of $493,982.00. The complaint further alleges that Ford and FMCC advised Goldstein and Goldstein & Co. that the financial statement would not satisfy their criteria, so on the following day, May 4, 2001, Goldstein and Goldstein & Co. revised the financial statement to show that the debtor had total current assets of $6,215,000.00, deleted the reference to the accumulated deficit and showed retained earnings of $792,100.00. Although the complaint alleges that the financial statements were given to Ford and FMCC, it can be reasonably inferred that Goldstein and Goldstein & Co. gave copies of the statements to the debtor, given that the statements were prepared for the debtor, and that Goldstein and Goldstein & Co. were the debtor's accountants. It is argued that the financial statements were simply forecasted balance sheets, predicting the future financial condition of the debtor, and that

predictions cannot be fraudulent. (Goldstein & Goldstein & Co.'s Mem. in Further Supp., at 14.) However, all of the alleged misrepresentations on the financial statements were related to the current financial status of the debtor, the total current assets and accumulated deficit, not expected future earnings.  The allegations that Goldstein and Goldstein & Co. prepared these financial statements, which reflected that the debtor's total current assets increased over $2 million in one day, without questioning the extraordinary change of financial information, satisfies the heightened pleading requirement because it alleges an "egregious refusal to see the obvious or investigate the doubtful," which can support an inference that those defendants acted with intent to defraud. See Complete Mgmt., 153 F. Supp. 2d at 334.

    3.  Reliance

    Under New York law, a complaint alleging fraud must plead actual, direct reliance by the debtor upon the representations or omissions allegedly made by the defendants. Granite Partners, 17 F.Supp. 2d at 288. "The reliance element is essentially causation in fact." Diduck, 974 F.2d at 278 (citing W. Prosser, The Law of Torts § 108, at 714 (4th ed. 1971)).  The complaint need not allege that defendants' omissions or representations are the "exclusive inducing cause" of the debtor's actions, but only that they are an "essential or inducing cause." Id. (citing Restatement Torts § 546.)  Moreover, merely alleging reliance is insufficient; the reliance must be justifiable or reasonable under the circumstances. Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003); Granite Partners, 17 F. Supp. 2d at 288.  Although a party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions, the court may consider the entire context of the transaction in assessing the reasonableness of a plaintiff's alleged

reliance. Id. at 289; Emergent, 343 F.3d at 195.  Some factors to consider are the complexity and magnitude of the transaction, sophistication of the parties, content of any agreements between them, existence of a fiduciary relationship and whether the debtor initiated the transaction. Id.; Granite Partners, 17 F. Supp. 2d at 290.

Taking all the allegations in the complaint as true, and drawing all reasonable inferences therefrom, the complaint adequately alleges that the debtor justifiably relied on Ford's misrepresentations and omissions.  It can be reasonably inferred that the debtor would not have submitted an application for Pappas to become its dealer-principal if it knew he was going to act as Ford and FMCC's agent and if it knew of the scheme to "dump" cars on the debtor for Ford's benefit.  It should be noted that the complaint alleges that Ford, as the debtor's franchisor, was a fiduciary of the debtor because it, by virtue of its position of dominance, forced the debtor to accept its terms in order to keep the franchise.  This alleged fiduciary relationship makes the allegations of the debtor's reliance more reasonable. See id.; See also discussion of allegations concerning Ford's fiduciary duty, infra.

The complaint also sufficiently pleads that the debtor justifiably relied on FMCC's alleged omissions and misrepresentations.  Just as with Ford's alleged misrepresentations and omissions, it can reasonably be inferred that, if the debtor had known that FMCC's lending facility was being offered as part of the alleged scheme to "dump" cars on the debtor for Ford's benefit, it would have declined the facility.

The complaint also adequately alleges that the debtor relied on Goldstein and Goldstein & Co.'s misrepresentations in the financial statements.  It can reasonably be inferred that had the debtor known of its true financial condition, and had known that its financial statements are

being falsified by its accountants at the request or suggestion of Ford or FMCC, it would not have entered into the transaction with Pappas which was being urged by Ford, or into the transaction with FMCC.

### 4. Damages

Common law fraud claims under New York law require a pleading that the defendants' omissions and/or representations were the proximate cause of the debtor's injury; in other words, that the debtor's injury was a foreseeable consequence of the defendants' misrepresentations or omissions. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172-173 (2d. Cir. 2005); Emergent, 343 F.3d at 197; Catton, 2006 WL 27470, at *10.

Here, the complaint sufficiently alleges losses that were proximately caused by Ford and FMCC's omissions and representations because based on those misrepresentations and omissions, Pappas was able to become the debtor's dealer-principal and manage it for Ford and FMCC's benefit.  It is also adequately alleged that the debtor suffered damages proximately caused by FMCC and Goldstein and Goldstein & Co.'s omissions and representations because it entered into contracts which it was financially incapable of handling.  It should be noted that none of the defendants argue that the debtor has not adequately pled damages as a result of their alleged omissions or misrepresentations.

Therefore, the complaint adequately alleges fraud against Ford, FMCC, Goldstein and Goldstein & Co. because it meets Rule 9(b)'s goals to give the defendants fair notice of the allegations.

B.  <u>Aiding and Abetting Fraud</u>

Ford argues that the complaint does not adequately allege the existence of fraud, which is a necessary element of aiding and abetting fraud.  FMCC argues that the complaint does not sufficiently allege that it assisted in the commission of the fraud.  Goldstein and Goldstein & Co. argue that the complaint does not plead that they had actual knowledge of the underlying fraud.

To state a claim for aiding and abetting fraud under New York law, a complaint must allege (1) the existence of an underlying fraud, (2) that the defendant had knowledge of the fraud and (3) that the defendant provided substantial assistance in the commission of the fraud. <u>Filler v. Hanvit Bank</u>, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), <u>aff'd</u>, No. 04-6295-CV, 04-6719-CV, 2005 WL 3270944 (2d Cir. Dec 02, 2005).  Claims of aiding and abetting fraud must meet the particularity standard of Rule 9(b). <u>Id.</u>

1.  <u>Existence of an Underlying Fraud</u>

As discussed above, the complaint adequately pleads the existence of an underlying fraud committed by Ford, FMCC, Goldstein and Goldstein & Co.

2.  <u>Knowledge</u>

The knowledge requirement of aiding and abetting fraud is met if the complaint sufficiently alleges that the defendants had actual knowledge of the underlying fraud. <u>Id.</u> (citing <u>Steed Fin. LDC v. Laser Advisers, Inc.</u>, 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003).  Constructive knowledge of the primary fraud, meaning "the possession of information which would cause a person exercising reasonable care and diligence to become aware of the fraud," does not suffice. <u>Id.</u> (citing <u>Williams v. Bank Leumi Trust Co.</u>, 96 Civ. 6695, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997).

The complaint adequately alleges that Ford and FMCC had actual knowledge of the underlying fraud because it alleges that Ford, through its representatives Clampett and Smythe, and FMCC, through its representative Epstein, attended the meeting held in early 2001 where the scheme to defraud the debtor was hatched. See Apollo Fuel Oil v. U.S., 195 F.3d. 74, 76 (2d Cir. 1999)("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal.").

However, the complaint does not allege that Goldstein and Goldstein & Co. had actual knowledge of the fraud, or allege any facts from which knowledge could be inferred. It is possible that Goldstein and Goldstein & Co. changed the financial statements as directed by Ford or FMCC without actually knowing of the alleged fraudulent scheme. Filler, 339 F. Supp. 2d at 557 ("With regard to the knowledge requirement . . . the complaint must allege facts which show that the defendant had actual knowledge of the underlying fraud."). Therefore, the aiding and abetting fraud claims against Goldstein and Goldstein & Co. must be dismissed.

### 3. Substantial Assistance

"A defendant substantially assists the commission of the fraud when it 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed' and when its 'actions . . . proximately cause[d] the harm on which the primary liability is predicated." Id. (quoting Cromer, 137 F. Supp. 2d at 470)); See also JP Morgan Chase Bank v. Winnick, No. 03 Civ. 8535, 2005 WL 2000107, at *6 (S.D.N.Y. Aug. 16, 2005)(citing Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)). "Moreover, even in the absence of a duty to act or disclose information, inaction on the alleged aider and abettor's part can provide a basis for liability where the inaction

was 'designed intentionally to aid the primary fraud.'" <u>ABF</u>, 957 F. Supp. at 1328 (quoting

<u>Armstrong v. McAlpin</u>, 699 F.2d 79, 91 (2d Cir. 1983)).  "Whether the assistance is substantial

or not is measured, in turn, by whether the 'action of the aider and abettor proximately caused

the harm on which the primary liability is predicated.'  Essentially, '[t]he substantial assistance

element has been construed as a causation concept. . .'" <u>Winnick</u>, 2005 WL 2000107, at *6

(internal citations omitted).  However, some question has been expressed whether the

"proximate cause" standard or a lesser standard should be utilized in the context of aiding and

abetting liability. <u>See</u> <u>id.</u>, at n.6.

 If one assumes that Ford is the primary perpetrator of the alleged fraud, the complaint

sufficiently alleges that FMCC substantially assisted Ford in the commission of the fraud.  The

complaint adequately alleges that FMCC extended the financing to the debtor to enable the

debtor to obtain the excess vehicles from Ford.  Without this funding, the debtor would not have

been able to obtain these vehicles and Ford would not have been able to implement the alleged

plan to rid itself of excess vehicle inventories by transferring them to the debtor.  Therefore, the

complaint adequately alleges that FMCC substantially assisted Ford in the commission of the

alleged fraud.

 By the same token, if one assumes that FMCC is the primary perpetrator of the underlying

fraud, the complaint sufficiently alleges that Ford substantially assisted in the commission of the

fraud.  The complaint alleges that Ford coerced the debtor into accepting Pappas as its dealer-

principal, without informing the debtor that Pappas would be acting as Ford's agent.  Without

Ford's omission to state that Pappas is its agent and its subsequent approval of Pappas as the

dealer principal, FMCC would not have had an insider in the debtor to accept its financing.

Therefore, the complaint adequately alleges that Ford provided substantial assistance in the commission of the fraud, whether the proximate cause or some lesser standard applies.

Since the complaint sufficiently pleads that Ford and FMCC knew of the fraud and substantially assisted in its commission, Ford and FMCC's motions to dismiss the aiding and abetting fraud claims against them are denied. However, since the complaint fails to plead that Goldstein and Goldstein & Co. had actual knowledge of the underlying fraud, the aiding and abetting fraud claims against them are dismissed.

C. Conspiracy to Commit Fraud

Ford moves to dismiss the claims of fraud, aiding and abetting fraud and conspiracy to commit fraud under Rule 9(b), but does not set forth any independent argument why a conspiracy claim should be dismissed. FMCC agues that the complaint does not sufficiently allege that an agreement existed between FMCC and the other defendants to defraud the debtor. Goldstein and Goldstein & Co. argue that they did not intend to defraud the debtor and that this claim does not meet Rule 9(b)'s particularity requirements. The trustee argues that the allegations in the complaint are sufficient because conspiracy only needs to be alleged under general principles of notice pleading and not with particularity.

Although the trustee is correct that general notice pleading under Rule 8 applies to claims of conspiracy, the underlying fraud claim must be pled with particularity. 777388 Ontario Ltd. v. Lencore Acoustics Corp., 142 F. Supp. 2d 309, at 319, n.4 (E.D.N.Y. 2001); Fed. R. Civ. P. 8 (2005). The court in Ontario stated:

> The respective roles of Fed.R.Civ. P. 8 and 9 in pleading conspiracy claims have been interpreted as follows: The general principles of "notice pleading" under Rule 8 apply to pleadings averring conspiracy. However, while Rule 8 demands only a

> "short and plain statement of the claim showing that the pleader is
> entitled to relief," in a pleading of conspiracy it is important that
> within the pleader's ability to do so, and without going into
> unnecessary detail, the opposing party be informed of the nature of
> the conspiracy charged, to which he may adequately plead . . . As
> for Fed. R. Civ. P. 9, its role in conspiracy claims has been
> described as follows: Rule 9(b) does not work to penalize a
> plaintiff merely because he was not privy to, and therefore, cannot
> plead the details of, the inner workings of a group of defendants
> who allegedly acted in concert to defraud him . . . On the other
> hand, the allegations supporting a claim of a conspiracy to defraud
> must be particular enough to give the defendants fair notice of
> what the plaintiffs claim is and the grounds upon which it rests.

Id. Some courts in New York have applied the heightened pleading requirements of Rule 9(b) to

conspiracy to defraud claims. See Winnick, 2005 WL 2000107. The court in Winnick explains

that some courts have applied Rule 9(b) to conspiracy to commit fraud claims "because of the

difficulty of parsing which elements of a conspiracy to commit fraud claim do not relate to the

underlying fraud. . ." Id. at n.3; See, e.g., Filler v. Hanvit, 01 Civ. 9510, 02 Civ. 8251, 2003 WL

22110773, at *3 (S.D.N.Y. Sept. 12, 2003); Spira v. Curtin, 97 Civ. 2637, 2001 WL 611386, at

*3 (S.D.N.Y. June 5, 2001). Whichever standard applies to pleading conspiracy to commit

fraud, it has been held that "the complaint must allege some factual basis for a finding of a

conscious agreement among the defendants." Filler, 339 F. Supp. 2d at 560. In this case,

however, whichever standard of pleading is applied, the complaint sufficiently alleges a

conspiracy to commit fraud against Ford and FMCC. The complaint does not, however,

sufficiently allege claim for conspiracy to commit fraud against Goldstein and Goldstein & Co.

Under New York law, there is no independent cause of action for conspiracy to commit

fraud. Farey-Jones v. Buckingham, 132 F. Supp. 2d 92, 104 (E.D.N.Y. 2001). "However, a

claim of conspiracy may lie where an underlying tort of fraud has been adequately pleaded." Id.

Therefore, to plead a claim for conspiracy to commit fraud, the complaint must allege the primary tort of fraud and the elements of conspiracy: a corrupt agreement between two or more persons, an overt act in furtherance of the agreement, the parties' intentional participation in the furtherance of a plan or purpose and the resulting damage or injury. Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

    1.  Corrupt Agreement

A formal agreement to defraud is not necessary to plead conspiracy to commit fraud. Miltland Raleigh-Durham v. Myers, 807 F. Supp. 1025, 1053 (S.D.N.Y. 1992). "The courts have held that disconnected acts, when taken together, may satisfactorily establish a conspiracy." Sedona Corp. v. Ladenburg Thalmann & Co., 03 Civ. 3210, 2005 WL 1902780, at * 17 (S.D.N.Y. Aug. 9, 2005)(citing First Fed. Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co., 629 F. Supp. 427, 443-44 (S.D.N.Y. 1986)).

Here, the complaint pleads that Ford and FMCC entered into a corrupt agreement to defraud the debtor.  The complaint alleges that, in early 2001, and at the time of the meeting described in paragraphs 30 through 40 of the complaint, Ford and FMCC, through their representatives Clampett, Smythe and Epstein, entered into a conscious agreement to defraud the debtor wherein Pappas would become the debtor's dealer principal to act as an agent for Ford and FMCC and accept financing, on the debtor's behalf, from FMCC in order to obtain Ford's excess vehicles.

However, the complaint does not allege any facts that would support an inference that Goldstein and Goldstein & Co. entered into an agreement with anyone to defraud the debtor, either expressly or though disconnected acts.  The allegations that, on May 3, 2001, Goldstein

and Goldstein & Co. prepared the debtor's financial statements, and revised them after Ford and FMCC told them that the statements were insufficient to meet Ford and FMCC's criteria, while sufficient to plead fraud by Goldstein and Goldstein & Co., are insufficient to raise an inference of an agreement to defraud.  As discussed earlier, the complaint does not plead, with sufficient particularity, that Goldstein and Goldstein & Co. had actual knowledge of the fraudulent scheme allegedly perpetuated by Ford and FMCC.  Without an adequate allegation that Goldstein and Goldstein & Co. had knowledge of Ford and FMCC's fraudulent scheme, it is impossible to find that the complaint sufficiently alleges an agreement between Goldstein and Goldstein & Co. and other defendants to engage in a scheme to defraud.  Therefore, the claims of conspiracy to commit fraud against Goldstein and Goldstein & Co. are dismissed.

2. <u>Overt Act</u>

The complaint sufficiently alleges that Ford and FMCC took overt acts in furtherance of the conspiracy to defraud the debtor.  It is alleged that Ford coerced the debtor into accepting Pappas as dealer principal and concealed that Pappas had agreed to act as Ford and FMCC's agent to manage the debtor for their benefit.  It is further alleged that Ford and FMCC instructed Goldstein & Goldstein & Co. to prepare Pappas's and the debtor's financial statements so that it would appear that Ford's dealer principal criteria and FMCC's lending criteria were met.  These are sufficient allegations of overt acts by Ford and FMCC in furtherance of the scheme to defraud the debtor.

The complaint also sufficiently alleges an overt act by FMCC in extending financing to the debtor, which enabled Pappas, as manager of the debtor, to obtain the excess vehicles from Ford on the debtor's behalf.

### 3. Intentional Participation

The complaint sufficiently alleges that Ford and FMCC intentionally participated in the common scheme to defraud the debtor.  As discussed above, the complaint adequately pleads that Ford and FMCC entered into an agreement to defraud the debtor and consciously and intentionally took overt acts in furtherance of that scheme.

### 4. Damages

As discussed under the fraud claim analysis, it is adequately alleged that the debtor was injured by this scheme to defraud and by Ford and FMCC's actions in furtherance of the conspiracy.

### D.  Fraudulent Conveyance pursuant to NY DCL § 276 and 11 U.S.C. §§ 544, 550

Ford argues that the trustee did not sufficiently allege that it had the intent to defraud when it received transfers from the debtor.  (See Complaint ¶¶ 223-225, 256-258.)  The trustee argues that actual intent was shown by pleading"badges of fraud."

Section 544(b) of the Bankruptcy Code authorizes the trustee to avoid of  "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [nonbankruptcy] law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(2005).  "The principle purpose of section 544(b) of the Bankruptcy Code 'is to undo pre-petition transfers of property that remove or withhold property from the estate to the prejudice of creditors.'"  Le Café Creme, Ltd. v. Roux (In re Le Café Creme), 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000)(citing Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 311 (Bankr. S.D.N.Y. 1999)).  Under § 550 of the Bankruptcy Code, an avoidable transfer may be recovered from the transferee. 11 U.S.C. 550 (2005).

New York's Debtor and Creditor Law (DCL) § 276, which the trustee is entitled to enforce under § 544(b), provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. § 276 (Mckinney's 2005).  To allege a claim under DCL § 276, the trustee must allege that "(1) the thing transferred has value of which the creditor could have realized a portion of its claim; (2) that this thing was transferred or disposed of by [the] debtor and (3) that the transfer was done with actual intent to defraud." Kittay v. Flutie N.Y. Corp (In re Flutie Corp.), 310 B.R. 31, 56 (Bankr. S.D.N.Y. 2004)(citing Gentry v. Kovler (In re Kovler), 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000)).  "Factual allegations supporting claims of intentional fraudulent transfer are scrutinized pursuant to F.R.C.P. 9(b), while taking into account that the Trustee is entitled to some leeway in the areas of scienter and particularity because he has no personal knowledge of the facts." Stratton Oakmont, 234 B.R. at 315 (citations omitted); See also  Atlanta Shipping Corp., Inc. v. Chemical Bank, 818 F.2d 240, 251 (2d Cir. 1987)(claims under DCL § 276 must be alleged in compliance with Rule 9(b)).

The intent examined is the intent of the transferor, not of the transferee. Le Café Creme, 244 B.R.at 239 (citing Stratton Oakmont, 234 B.R. at 318).  If there was an actual intent to hinder, delay or defraud creditors, the conveyance may be set aside under DCL § 276 regardless of the adequacy of the consideration given or the solvency of the transferor. United States v. McCombs, 30 F.3d 310, 328 (2d Cir. 1994)(citing ACLI Gov't Sec.v. Rhoades, 653 F. Supp. 1388, 1394 (S.D.N.Y. 1987)).

The Second Circuit has found certain "badges of fraud" to be circumstantial evidence of actual intent because actual intent is rarely shown by direct evidence. See Sharp Int'l Corp. v. State Street Bank and Trust Corp. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005); Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2d Cir. 1983). Such "badges of fraud" include "(1) lack or inadequacy of consideration; (2) family, friendship or close associate relationship between the parties; (3) retention of possession, benefit or use of the property in question by the debtor; (4) the financial condition of the transferor both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency of threat of suits by creditors and (6) the general chronology of the events or transactions under inquiry." Id. at 1582-1583. Therefore, allegations of badges of fraud must be made in the context of the transactions.

Furthermore, "[t]he facts are not to be atomized. Where a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'" Pereira v. Checkmate Communications Co. (In re Checkmate Stereo and Elecs., Ltd.), 9 B.R. 585, 612 (Bankr. E.D.N.Y. 1981)(citing Buffum v. Peter Barceloux Co., 289 U.S. 227, 232, 53 S.Ct. 539, 77 L. Ed. 1140 (1933)); See also Stratton Oakmont, 234 B.R. at 317 ( "Courts will overlook the formal structure of a transaction where the knowledge and intent of the parties involved indicate that the transactions should be viewed together." ). Allegations of a scheme to defraud a debtor might also be sufficient to plead actual intent for fraudulent transfer purposes if the payments were made in furtherance of the scheme and had the necessary effect of hindering, delaying, or defrauding the creditors. See Checkmate, 9 B.R. at 613.

Therefore, in order to sufficiently state a claim for intentional fraudulent conveyance, the trustee must allege facts or badges of fraud with particularity that give rise to an inference that the payments were made to Ford with actual intent to hinder, delay or defraud other creditors.

### 1.  Family, Friendship or Close Associate Relationship

The Trustee argues that a badge of fraud exists because Pappas was the agent of Ford and by virtue of this agency, and by implementing the alleged scheme, Ford was able to manage the debtor for Ford's benefit.  However, the complaint does not allege that Pappas made the allegedly fraudulent transfers. (Complaint ¶ 257.)  Other alleged insiders with check signing authority on behalf of Monahan Ford existed, such as Ben Hamo and Jossef Kahlon (officers of National), and they are not alleged agents of Ford. (Complaint ¶ 92.)  Therefore, this badge of fraud is not adequately alleged.

### 2.  Existence/Effect of a Course of Conduct After the Debt Was Incurred

The trustee argues that the weak financial condition of the debtor prior to the transfers and the worsening of the debtor's financial condition after the transfers is a badge of fraud. Allegations that fraudulent transfers caused assets to be placed beyond the reach of creditors may suffice as a badge of fraud. See Lippe v. Bairnco, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (listing cases where fraudulent intent was found where the transfers depleted the debtors' assets); See also In re All Am. Petroleum Corp., 259 B.R. 6, 18 (Bankr. E.D.N.Y. 2001) (finding a badge of fraud when a "pattern or course of conduct [was shown] to transfer assets of the Debtor to other parties at a time when the Debtor was undergoing great financial difficulties . . ").

As discussed above, it is alleged that the scheme to defraud the debtor was intended to benefit Ford and to the debtor's detriment.  These allegations, if supplemented with sufficiently particularized allegations that the transfers were made in furtherance of the fraud, may be sufficient to allege actual intent under DCL § 276 because the scheme allegedly had the necessary effect of worsening the debtor's financial condition and hindering, delaying or defrauding the debtor's creditors.  See Checkmate, 9 B.R. at 613.  However, the complaint merely lists the date and amount of the transfer and does not assert any factual allegations that these transfers were made in furtherance of the scheme to defraud.  Cf. Stratton Oakmont, 234 B.R. at 317 (where the trustee alleged that the alleged fraudulent transfers were "in order to effectuate their fraudulent scheme.").  Therefore, this badge of fraud is insufficiently alleged.

      3.  General Chronology of Events

The trustee's main argument for finding fraudulent intent rests on Ford's allegedly "clear course of conduct in placing itself in a position of domination and control over the Debtor's assets with the clear intent to aggrandize itself." (Tr. Mem. of Law in Opp'n to Ford's Mot. to Dismiss, at 29.)  As discussed above, the complaint adequately alleges the scheme to defraud the debtor, but does not allege that the transfers were made in furtherance of this scheme, or how that was the case.  Therefore, the argument that the complaint pleads this badge of fraud fails as well.

Therefore, since the alleged badges of fraud are insufficiently pled, Ford's motion to dismiss the fraudulent conveyance claim under Bankruptcy Code § 544 and DCL § 276 is granted.

E.  Deepening Insolvency/Lender Liability

FMCC argues that the trustee's claims of deepening insolvency and lender liability must be dismissed because making a bad loan is not actionable.  Ford's only argument against these claims is that the trustee lacks standing, which is rejected for the reasons set forth above. Goldstein & Co. and Goldstein argue that deepening insolvency is only a theory of damages and not a separate actionable tort.  The trustee contends that it is immaterial whether deepening insolvency is a separate tort or theory of damages and that recovery is available against the defendants.

"Deepening insolvency refers to the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt."  Global Servs. Group v. Atl. Bank of N.Y. (In re Global Servs.), 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004)(citing Schacht v. Brown, 711 F.2d 1343, 1350 (7th Cir.1983)).  One seeking to recover for deepening insolvency must plead that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt. Id. at 458.

The concept of deepening insolvency emerged in case law in connection with the adverse interest exception to the rule that an agent's knowledge will be imputed to his principal. See Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litig.), 523 F. Supp. 533, 540-541 (S.D.N.Y. 1980)(refusing to impute the knowledge and conduct of the debtor's insiders' wrongdoing to the debtor because the insiders allegedly "created the false appearance of fiscal salubrity to conceal their past acts of mismanagement, and to raise capital for their further plundering. . . [which was] antagonistic to the interests of [the debtor] . . . A corporation is not a

biological entity for which it can be presumed that any act which extends its existence is biological entity for which it can be presumed that any act which extends its existence is beneficial to it."). Since then, some courts have held that deepening insolvency may be an independent cause of action. Global, 316 B.R. at 457; see also Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-52 (3d. Cir. 2001). Other courts have viewed it as a theory of damages. Global, 316 B.R. at 457; Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488, 494 (S.D.N.Y. 1996); Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer, Keifer & Shall (In re Gouiran Holdings, Inc.), 165 B.R. 104, 107 (E.D.N.Y. 1994).

Goldstein & Co. and Goldstein argue that the court in Global found that deepening insolvency is not an independent tort. (Goldstein and Goldstein & Co.'s Mem. of Law in Supp., at 23-4.) However, the Global court specifically chose not to address that issue, holding instead that whether or not deepening insolvency is a tort or a theory of damages, prolonging an insolvent corporation's life, without more, will not result in liability. Global, 316 B.R. at 458. Therefore, Goldstein and Goldstein & Co.'s motion to dismiss on Rule 12(b)(6) grounds is denied.

FMCC relies on Global and asserts that it stands for the proposition that making a loan, knowing that a debtor would not be able to repay, is not actionable. (FMCC's Mem. of Law in Supp., at 13.) However, Global specifically states: "Notably, the Complaint does not allege or imply that [the lender] extended the loans to enable the [directors of the debtor corporation] to siphon off the funds or commit some other wrong." Global, 316 B.R. at 459. Here, unlike in Global, the complaint alleges that FMCC made a loan to enable Ford to defraud the debtor. Therefore, although the general rule is that making a bad loan will not expose a lender to

liability, the complaint alleges claims which may expose FMCC to liability under the deepening insolvency theory.

The deepening insolvency claim is based on the fraud that enabled the defendants to "exploit and loot the debtor for [the defendants'] own purposes," and therefore the underlying fraud allegations must be stated with particularity in accordance with Rule 9(b). (Complaint ¶ 216); See also Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996). As examined above, the underlying fraud allegations meet the particularity requirements of Rule 9(b). The complaint sufficiently alleges that the debtor was experiencing financial difficulties and that defendants' fraudulent acts contributed to the continued operation of the debtor and its increased debt. Therefore, the complaint sufficiently alleges actions on behalf of the moving defendants which might give rise to deepening insolvency liability; therefore, the defendants' motions to dismiss the deepening insolvency claims is denied.

In the absence of opposition by the trustee, the lender liability claim against FMCC is dismissed.

F. Breach of Fiduciary Duty and Accounting

Ford argues that there is no fiduciary relationship between a franchisor and a franchisee as a matter of law. FMCC also argues that a fiduciary relationship does not arise between a lender and a borrower and as such cannot be liable for breach of fiduciary duty or for an accounting. The trustee argues that under the circumstances in this case, fiduciary relationships were created between the franchisor/ franchisee and lender/borrower. Goldstein and Goldstein & Co. argue that the allegations supporting a breach of fiduciary duty claim against them were not stated with particularity.

1. Ford and FMCC

It is generally held that a franchisor/franchisee relationship does not give rise to a fiduciary relationship.  See Fiore v. McDonald's Corp., Nos. 95-CV-2708, 96-CV-0376, 1996 WL 331090, at *3, n.3 (E.D.N.Y. 1996)(citing McGuirk Oil Co. v. Amoco Oil Co., 889 F.2d 734 (6th Cir. 1989)).  However, a fiduciary relationship may arise in a franchisor/franchisee relationship if a confidential relationship was created or if the franchisee was obligated to accept the requirements allegedly imposed by the franchisor because of the franchisor's position of dominance.  Lake Erie Distribs., Inc., v. Martlet Importing Co., 221 A.D.2d 954, 955-56 (App. Div. 1995).

Similarly, a fiduciary relationship does not usually exist between a lender and a borrower; however, a fiduciary relationship may exist between the debtor and creditor when there is a relationship of confidence, trust, or superior knowledge or control. Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002).

Here, the trustee alleges that Ford, as franchisor, dominated the debtor and obligated the debtor to accept Pappas as its dealer-principal.  The trustee also alleges that FMCC exerted control over the debtor and had superior knowledge that the debtor did not meet its lending criteria and that Pappas, as dealer-principal, would act as Ford and FMCC's agent.  These allegations, if pled with sufficient particularity, could state a claim that a fiduciary relationship arose between the franchisee/franchisor and debtor/creditor.

To the extent that a breach of fiduciary claim is based on fraud, the allegations surrounding the breach of fiduciary duty claim must be stated with particularity. Kolbeck, 939 F.Supp. at 245; Frota, 639 F. Supp. at 1193.  Since the allegations supporting the claim of fraud

were stated with sufficient particularity and since fiduciary relationships can arise between a

debtor and creditor and franchisor and franchisee, Ford and FMCC's motions to dismiss the

breach of fiduciary duty claims against them must be denied because whether fiduciary duties

actually arose between the parties is a question of fact not properly addressed on this motion.

See Lake Erie, 221 A.D.2d at 955-56 ("Whether plaintiff was obligated to accept the

requirement allegedly imposed by [its franchisor] because of [the franchisor's] dominance . . . [is

a] question[] of fact not properly decided on a motion to dismiss.").

### 2. Goldstein and Goldstein & Co.

Goldstein and Goldstein & Co. do not argue that they were not in a fiduciary relationship

with the debtor, but argue that the claimed breach of fiduciary duty is inadequately alleged. As

discussed above, the fraud claim against Goldstein and Goldstein & Co. is sufficiently pled and,

therefore, the allegations of their breach of fiduciary duties to the debtor are also sufficiently

pled.

Therefore, breach of fiduciary duty claims against Ford, FMCC, Goldstein and Goldstein

& Co. will not be dismissed. However, in the absence of opposition, Ford Credit's motion to

dismiss the accounting claim against it is granted.

### G. Aiding and Abetting Breach of Fiduciary Duty

FMCC argues that the complaint fails to plead that it knowingly participated or had

actual knowledge of the fraud. The trustee argues that the complaint adequately pleads that

FMCC aided and abetted Pappas's breach of fiduciary duty. Ford's argument with respect to this

claim is that the trustee does not have standing, which was rejected above. Goldstein and

Goldstein & Co. argue that the complaint does not sufficiently allege that they knew of the breaches of fiduciary duty.

To state a claim for aiding and abetting a breach of fiduciary duty under New York law, the claimant must plead: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or substantially assisted in the breach; and (3) that the plaintiff suffered damages as a result of the breach.  S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-8 (2d Cir. 1987); Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986); Kolbeck, 939 F. Supp. at 245.  This claim is based upon New York courts' longstanding acceptance of the principle that "one who knowingly participates with a fiduciary in a breach of trust is liable to the beneficiary for any damage caused thereby." Whitney, 782 F.2d at 1115 (citing Wechsler v. Bowman, 285 N.Y. 284, 291 (1941)); S & K Sales, 816 F.2d at 848.  To the extent that the underlying breach of fiduciary duty claims are based on fraud, the allegations of aiding and abetting liability must also meet the particularity requirements of Rule 9(b). Kolbeck, 939 F. Supp. at 245.

      1.  Breach of Fiduciary Duty

The complaint alleges that the following parties owed fiduciary duties to the debtor: (1) Pappas, as president and controlling shareholder of the debtor, (2) Ford and FMCC, as entities who dominated and controlled the debtor, (3) Goldstein, and Goldstein & Co. as the debtor's accountants, (4) Kay Pappas (Pappas's wife) as the debtor's bookkeeper, (5) Ben-Hamo, National and Kahlon as partners, joint-venturers, or managing agents of the debtor, and (6) Leon, as post-petition manager of the debtor. (Complaint ¶¶ 147-151.)  The complaint then alleges that to the extent that the defendants are not found to have breached their own fiduciary duties to the

debtor, they are liable for aiding and abetting the other defendants' breaches of fiduciary duties. (Complaint ¶ 163.)

To analyze the sufficiency of this claim's pleading, it is necessary to identify precisely the breach of fiduciary duty for which the trustee seeks to hold the defendants liable for aiding and abetting. See Kolbeck, 939 F.Supp. at 245 ("To analyze a claim of secondary liability, the court first must determine the contours of the primary violation on which the secondary liability is alleged to be based.").

As discussed above, the breach of fiduciary duty claims against Ford, FMCC, Goldstein and Goldstein & Co. are stated with the sufficient particularity required by Rule 9(b).  In addition, the moving defendants do not argue that Pappas did not breach his fiduciary duties to the debtor.  Pappas was in a fiduciary relationship with the debtor from the time he acquired 51% of the shares of Monahan Ford and became manager of the debtor. See Barbour v. Knecht, 296 A.D.2d 218, 227, 743 N.Y.S.2d 483, 491 (1st Dep't 2002)("Majority shareholders and directors of a close corporation stand in a fiduciary relationship with the corporation and minority stockholders and are required to exercise the utmost good faith."). Therefore, the first element of aiding and abetting breach of fiduciary duty is met.

### 2. Knowing Inducement or Substantial Assistance

In the Second Circuit, a plaintiff must allege that the aider and abettor had actual knowledge of the breach of duty and induced or participated in it, but need not allege that the aider and abettor had an intent to harm. See S&K Sales, 816 F.2d at 848; Hirsch v. Pa. Textile Corp., Inc. (In re Centennial Textiles, Inc.), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998).  However, constructive knowledge is legally insufficient to impose aiding and abetting liability. Kolbeck,

939 F. Supp. at 246 ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability.  Rather New York courts and federal courts in this district have required actual knowledge.").  "The relevant knowledge for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty." Diduck, 974 F.2d at 282-3 (citing Restatement (Second) of Torts § 876(b)(1965)).

A defendant may be held liable for aiding and abetting another's breach of fiduciary duty if he knowingly provided "substantial assistance" to the primary violator. S&K Sales, 816 F.2d at 849; Kolbeck, 939 F. Supp. at 247.  Under New York law, "[s]ubstantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" State Street, 403 F.3d at 50 (citing Kaufman v. Cohen, 307 A.D.2d 113, 126, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)). However, the inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff. Sharp, 403 F.3d at 50; Kolbeck, 939 F.Supp. at 247.

It is sufficiently alleged that FMCC had actual knowledge of Pappas's intended breach of his duties by managing the debtor for the benefit of Ford by permitting Ford to offload an excess and hard-to-sell vehicles on the debtor, because FMCC's agent, Epstein, was allegedly present at the meeting where the scheme to defraud was hatched.  FMCC's knowledge that Pappas carried out the scheme to defraud and breached his duties and FMCC's knowing substantial assistance in that breach are also sufficiently pled through the allegations that FMCC aided in the falsification

the debtor's financial statements to enable the debtor to acquire FMCC's financing, which, in turn, enabled Pappas to acquire Ford's excess vehicles on behalf of the debtor, to the debtor's detriment.

Similarly, it is sufficiently alleged that Ford had actual knowledge of Pappas's intended breach of his duties because its agents, Clampett and Smythe, were also allegedly present at the early 2001 meeting when the scheme to defraud the debtor was created.  It is also adequately alleged that Ford, knowing that the debtor (through Pappas) accepted financing from FMCC (which the debtor could not financially support), assisted Pappas in breaching his fiduciary duties by providing, or dumping, its excess cars on the debtor.   These alleged actions sufficiently plead that Ford provided substantial assistance to Pappas in breaching his fiduciary duties to the debtor.

The complaint alleges that Pappas enlisted Goldstein and Goldstein & Co. to falsify the debtor's financial statements, as well as his own financial statements, but does not allege that Goldstein & Co. or Goldstein had actual knowledge of the scheme planned by Ford, FMCC, and Pappas.  Nor does the complaint allege any facts from which an inference can be drawn that Goldstein and Goldstein & Co. had actual knowledge of Ford, FMCC, or Pappas's subsequent alleged breaches of their duties. Without actually knowing of the breaches of fiduciary duty, Goldstein and Goldstein & Co. could not have knowingly participated in those breaches of fiduciary duty, either by affirmatively assisting or by failing to act.

       3. <u>Damages</u>

As discussed above, the alleged breaches of fiduciary duties (the alleged fraud) caused injuries to the debtor.

Therefore, Ford and FMCC's motions to dismiss the claims against them for aiding and abetting breach of fiduciary duty are denied.  Goldstein and Goldstein & Co.'s motions to dismiss the aiding and abetting breach of fiduciary duty claims against them are granted.

H.  Equitable Subordination

FMCC argues that the complaint does not assert any factual allegation that it controlled the debtor to gain an unfair advantage, which is needed to equitably subordinate its claim.  The trustee contends that the complaint alleges all the necessary requirements for the equitable subordination.

Section 510(c)(1) of the Bankruptcy Code authorizes this court to equitably subordinate claims. 11 U.S.C. 510(c)(1)(2005).  Pursuant to equitable subordination, a claim may be subordinated if that claimholder is guilty of misconduct. 4 Lawrence P. King, et al., Collier on Bankruptcy § 510.05[1] (15th Ed. Revised 2005).  This remedy is available when (1) the claimholder engaged in inequitable conduct, (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimholder, and (3) equitable subordination is consistent with bankruptcy law.  Global, 316 B.R. at 462; 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).

1.  Inequitable Conduct

Traditionally, equitable subordination was limited to cases involving fraud, illegality or breach of fiduciary duty; undercapitalization; and control or use of the debtor as an alter ego for the benefit of the claimholder. 80 Nassau, 169 B.R. at 838.  However, the term can also be used to refer to conduct that is lawful but shocks one's good conscience. 80 Nassau, 169 B.R. at 837.

The court will closely scrutinize the conduct of claimants who bear a close relationship with the debtor, including officers, directors and shareholders, to assess whether their transactions with the debtor would justify equitable subordination of their claims. King, <u>supra</u>, ¶510.05[3], at 510-23; <u>Pepper v. Litton</u>, 308 U.S. 295, 306-7, 60 S. Ct. 238, 84 L. Ed. 281 (1939). If the creditor is an insider, its conduct is subject to a higher level of scrutiny. King, <u>supra</u>, ¶ 510.05[3], at 510-23-510-24.

Courts have equitably subordinated an insider creditor's claim in the situations involving (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimholder. <u>The Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)</u>, 277 B.R. 493, 513 (Bankr. S.D.N.Y. 1999)(quoting <u>80 Nassau</u>, 169 B.R. at 837).

A non-insider or non-fiduciary creditor's actions will be deemed inequitable if that creditor has "dominated or controlled the debtor to gain an unfair advantage" or has breached "an existing, legally recognized duty arising under contract, tort or other area of law." <u>80 Nassau</u>, 169 B.R. at 840. "In the absence of a contractual breach, the [trustee] must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." <u>Id.</u> "In the absence of domination or control by the creditor or breach of an existing legally recognizable duty, an allegation that a lender knew or should have known that the loan would render the debtor insolvent is insufficient to equitably subordinate the lender's claim." <u>Global</u>, 316 B.R. at 462 (citing <u>In re Dry Wall Supply, Inc.</u>, 111 B.R. 933, 938 (D.Colo. 1990)).

Since fraud would suffice as "inequitable conduct," whether FMCC is deemed an insider or not, and since the claim of fraud against FMCC was adequately pled, the first element of equitable subordination is also adequately pled.

### 2. Injury to the Debtor or Creditors/Unfair Advantage

In order to state an equitable subordination claim, the complaint must plead that the "creditor's offending conduct caused injury to the debtor or its creditors, or resulted in an unfair advantage for the claimant." 80 Nassau, 169 B.R. at 840. As to the injury to the creditors, it is sufficient to allege that the general creditors are less likely to collect their debts as a result of the alleged inequitable conduct. Id.; KDI, 277 B.R. at 514. "If the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner." 80 Nassau, 169 B.R. at 840; KDI, 277 B.R. at 514.

FMCC argues that this element of equitable subordination is not adequately pled because the complaint does not allege that it received an unfair advantage over the other creditors or that the other creditors suffered injury. This argument fails because, based on the facts alleged, a logical inference can be drawn that FMCC's extension of credit to the debtor, while allegedly knowing of the debtor's weak financial status, and in furtherance of the scheme to offload excess and hard-to-sell Ford vehicles on the debtor, makes it less likely that the general creditors will receive payment on their claims. See KDI, 277 B.R. at 515 (the logical inference that the general creditors will be less likely to recover because of a specific creditor's leveraging of the debtor's assets satisfied the pleading requirements). Therefore, the complaint's allegations plead the second element of equitable subordination.

### 3.  Consistency with Bankruptcy Law

The requirement that equitable subordination must comport with bankruptcy law is examined only after the first two elements of equitable subordination are sufficiently alleged.  80 Nassau, 169 B.R. at 841.  "If a court determines that the party advocating equitable subordination has satisfied the first two prongs . . . it is difficult to imagine a situation in which the equitable subordination would not be warranted by bankruptcy law. . . [S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the [equitable subordination] test is likely to be moot."  Id.

Therefore, since the elements of equitable subordination are adequately alleged, FMCC's motion to dismiss the equitable subordination claim against it is denied.

### I.  Promissory Estoppel

FMCC argues that the complaint does not allege any promises that it made to the debtor. In the absence of opposition, the promissory estoppel claim against FMCC is dismissed.

### J.  Automobile Dealer's Day in Court Act & Franchised Motor Vehicle Dealer Act

FMCC argues that it is not considered an "automobile manufacturer" under the Automobile Dealer's Day in Court Act ("ADDCA") or a "franchisor" under the Franchised Motor Vehicle Dealer Act ("Dealer Act") and that these claims should be dismissed under Rule 12(b)(6).  FMCC also argues that it cannot be held liable on an alter-ego theory under Rule 12(b)(6).  The trustee contends that FMCC is an automobile manufacturer under the ADDCA because it is a wholly owned financing subsidiary of Ford and assists Ford in distributing its vehicles.  The trustee does not oppose the motion to dismiss the Dealer Act violation claim against FMCC.

The ADDCA is "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." <u>Stadium Chrysler Jeep, LLC, v. DaimlerChrysler Motors Co.</u>, 324 F. Supp. 2d 587, 594 (D.N.J. 2004)(quoting <u>Northview Motors, Inc. v. Chrysler Motors Corp.</u>, 227 F.3d 78, 92 (3d Cir. 2000); <u>See also</u> 15 U.S.C. §§ 1221-25 (2005). The ADDCA authorizes a civil action to be brought against an automobile manufacturer engaged in commerce when the manufacturer has failed to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . ." <u>Stadium Chrysler</u>, 324 F. Supp. 2d 594; 15 U.S.C. at § 1222. "Good faith" has a narrow and restricted meaning under the ADDCA. <u>Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.</u>, 83 F. Supp. 2d 384, 388 (S.D.N.Y. 2000). "First, the plaintiff must demonstrate that an 'automobile manufacturer' coerced, intimidated or threatened him. Second, the plaintiff must prove that any coercion or intimidation was designed to achieve some improper of wrongful objective." <u>Id.</u> The ADDCA defines an automobile dealer as: "any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221.

The complaint alleges that FMCC violated the ADDCA by virtue of the fact it is the "alter ego and wholly owned subsidiary" of Ford, and that it "[used] threat and coercion against the debtor for the gain of the manufacturer . . .[and] by failing to act in good faith in performing

or complying with the terms of its franchise agreement with Monahan Ford. . ." (Complaint ¶¶ 121-22.)

FMCC argues that pursuant to Lazar's Auto Sales, Inc. v. Chrysler Financial Corp., 83 F. Supp. 2d 384 (S.D.N.Y. 2000), a finance company is not a "manufacturer" under the ADDCA as a matter of law. (See FMCC's Mem. of Law in Supp., at 24.); Lazar's Auto, 83 F. Supp. 2d at 387.  The Lazar's Auto court stated: "To put it as simply as possible, [the finance company] does not make cars.  It provides financing for persons (in this case automobile dealers) who want to purchase cars at wholesale for resale at retail." Id.  However, FMCC ignores exception that the Lazar's Auto court pointed out: "The only way that [the finance company] can be held liable under the ADDCA is if the evidence establishes that it is an agent of [the automobile manufacturer] or is otherwise under [the automobile manufacturer's ] control. Id. (citing Keys Jeep Eagle, Inc. v. Chrysler Corp., 897 F. Supp. 1437 (S.D.Fla. 1995), aff'd without opinion, 109 F.3d 773 (11th Cir. 1997)).

Here, the complaint does not allege any factual allegations in support of its conclusory statement that FMCC is the alter ego of Ford. (See Complaint ¶¶ 68, 122.)  The question, therefore, is whether the complaint sufficiently alleges FMCC is the agent or under control of Ford so as to constitute an automobile manufacturer for purposes of the ADDCA.

The trustee attempts to show that the complaint sufficiently alleges that FMCC is Ford's agent by relying on numerous cases which found that an agency relationship was inferred, and control was found, between an automobile manufacture and its wholly owned financing subsidiary because the financing subsidiary facilitated in the distribution of the parent's vehicles. (See Tr. Mem. in Opp'n to FMCC's Mot. to Dismiss, at 26-8.); DeValk Lincoln Mercury, Inc. v.

Ford Motor Co., 550 F. Supp. 1199 (N.D.Ill. 1982); TLMS Motor Corp. v. Toyota Motor Distribs., Inc., 912 F. Supp. 329 (N.D.Ill. 1995); Stepp v. Ford Motor Credit Co., 623 F. Supp. 583 (E.D.Wis. 1985); Colonial Ford, Inc. v. Ford Motor Co., 592 F.2d 1126 (10th Cir. 1979). None of the cases cited by the trustee in support of his argument apply this jurisdiction's law.

In New York, to sufficiently allege that FMCC is an automobile manufacturer under the ADDCA, the complaint must plead facts that show that it is either under the control of Ford or agent of Ford. Lazar's Auto, 83 F. Supp. 2d at 387. To do this, the complaint would have to allege facts to support a theory of apparent or actual agency. Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp., No. 99 CIV 0213, 1999 WL 123501, at * 6 (S.D.N.Y. March 2, 1999). "To recover on a theory of apparent authority in New York, plaintiffs must establish two facts: (1) [the automobile manufacturer] was responsible for the appearance of authority in [the financing company] to conduct the transaction in question and (2) [the debtor dealership] reasonably relied on the representations of [the financing company]." Id. (quoting Herbert Const. Co. v. Cont'l Ins. Co., 931 F.2d 989, 993-94 (2d Cir. 1991)).

Here, the complaint has failed to plead the minimum facts from which to infer that FMCC had the apparent authority to act on Ford's behalf or was under Ford's control. Merely alleging that FMCC is Ford's wholly owned subsidiary is insufficient to allege the existence of an agency relationship between Ford and FMCC. See Chrysler Fin., 1999 WL 123501 at *6. Therefore, the claim against FMCC for violating the ADDCA is dismissed. In the absence of opposition, the claim against FMCC for violating the Dealer Act is dismissed.

K.  Conspiracy to Violate the ADDCA & Dealer Act

FMCC argues that the complaint does not allege the necessary requirements of conspiracy to violate the ADDCA, such as an overt act in furtherance of the conspiracy or conduct that was coercive against Monahan Ford.  The trustee argues that the claim for conspiracy to violate the ADDCA is sufficient for the same reasons the fraud and conspiracy to commit fraud claims are sufficient. (Tr. Mem. of Law in Opp'n to FMCC's Mot. to Dismiss, at 28.)  The trustee does not assert any opposition to FMCC's motion to dismiss the claim for conspiracy to violate the Dealer Act.

As discussed above, to plead a claim for civil conspiracy, it is necessary to plead the primary tort, here the violation of the ADDCA, and the basic elements of conspiracy: a corrupt agreement between two or more persons, an overt act in furtherance of the agreement, the parties' intentional participation in the furtherance of a plan or purpose and  the resulting damage or injury. Chrysler, 778 F. Supp. at 1267.  As discussed above, the complaint sets forth allegations of the primary tort, i.e., Ford's violation of the ADDCA when it allegedly coerced the debtor to accept Pappas as its dealer-principal and implemented its alleged scheme to control the debtor through Pappas and thereby to move excess and hard-to-sell vehicles to the debtor.

1.  Corrupt Agreement

As discussed earlier, the complaint adequately pleads the facts surrounding the 2001 meeting where Ford and FMCC allegedly hatched the scheme to place Pappas in control of the debtor; to offload excess and undesirable vehicles on the debtor; and to finance the debtor's acquisition of those vehicles using false financial statements. These allegations are sufficient to allege a corrupt agreement between Ford and FMCC to violate the ADDCA.

2. <u>Intentional Overt Act in Furtherance of the Agreement</u>

As discussed in the conspiracy to defraud analysis, the complaint alleges that FMCC intentionally extended the lending facility to the debtor in furtherance of the scheme to manage the debtor for Ford 's benefit.  This allegation of  knowing assistance is sufficient to plead an overt act in furtherance of the agreement which allegedly violated the ADDCA.

3. <u>Damages</u>

As discussed above, the debtor was injured by the coercion to accept Pappas as its dealer-principal and by the implementation of the scheme to defraud.

Therefore, since the complaint adequately alleges the primary violation of the ADDCA and the elements of conspiracy, FMCC's motion to dismiss the claim for conspiracy to violated the ADDCA against it is denied.  In the absence of opposition, the claim against FMCC for conspiracy to violate the Dealer Act is dismissed.

L.  <u>Punitive Damages</u>

FMCC, Goldstein and Goldstein & Co. argue that punitive damages is not a separate cause of action, but that it is an element of damages.  In the absence of opposition, the punitive damages claim against FMCC and Goldstein and Goldstein & Co. is dismissed.  This is without prejudice to the trustee's right to recover punitive damages as an element of damages in connection with other claims, if the facts warrant.

Conclusion

For the reasons stated in this opinion, this court holds that (1) the trustee has standing to bring this action; (2) Ford and FMCC's motions to dismiss the fraud, aiding and abetting fraud, conspiracy to commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and deepening insolvency claims against them are denied; (3) Goldstein and Goldstein & Co.'s motion to dismiss the fraud, deepening insolvency and breach of fiduciary duty claims against them are denied; (4) Goldstein and Goldstein & Co.'s motions to dismiss the aiding and abetting fraud, conspiracy to commit fraud and aiding and abetting breach of fiduciary duty claims against them is granted; (5) Ford's motion to dismiss the fraudulent conveyance claim against it pursuant to Bankruptcy Code § 544 and New York's Debtor & Creditor Law § 276 is granted; (6) FMCC, Goldstein and Goldstein & Co.'s motions to dismiss the punitive damages claim is granted; (7) FMCC's motion to dismiss the claims against it for an accounting, lender liability, violation of the Franchised Motor Vehicle Dealer Act ("Dealer Act"), conspiracy to violate the Dealer Act, promissory estoppel, and violation of the Federal Automobile Dealer's Day in Court Act ("ADDCA") is granted; and (8) FMCC's motion to dismiss the conspiracy to violate the ADDCA and equitable subordination claims against it is denied.  The trustee is given leave to replead all of the dismissed claims, with the exception of the punitive damages claim. The trustee is directed to settle an appropriate order.

Dated:  Brooklyn, New York
         March 20, 2006

                                        \s\*Carla E. Craig*
                                        CARLA E. CRAIG
                                        United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

In re:                                                    Case No. 02-23134-608

MONAHAN FORD CORPORATION OF FLUSHING,                     Chapter 7


                              Debtor

---------------------------------------------------------------------x

ALAN NISSELSON, ESQ., as Chapter 7 Co-Trustee of

MONAHAN FORD CORPORATION OF FLUSHING,

                              Plaintiffs,


              - against -                                  Adv. Pro. No. 04-01500-608


FORD MOTOR COMPANY, FORD MOTOR CREDIT

COMPANY, GEORGE PAPANTONIOU a/k/a/

GEORGE PAPPAS, KAY PAPANTONIOU, GADI

BEN-HAMO, NATIONAL STAR EXECUTIVE

SALES, LLC, JOSSEF KAHLON, SAMUEL

GOLDSTEIN & CO., P.C., STUART GOLDSTEIN

and STEVE LEON,

                              Defendants.

---------------------------------------------------------------------x


### MAILING CERTIFICATE


         I, Sharon L. Weiss, hereby affirm that on March 20, 2006 a copy of a Decision
was delivered to the parties named below by United States Postal Service first class mail,
telecommunication, facsimile or any other delivery method, as follows:


Regina Griffin                          Byron L. Friedman

Howard L. Simon                         Wilson Elser Moskowitz Edelman & Dicker

Brauner Baron Rosenzweig & Klein,LLP    3 Gannett Drive

61 Broadway                             White Plains, New York 10604

New York, New York 10006

Michael J. Levin
Barger & Wolen, LLP
10 E. 40th Street
New York, New York 10106

Ronald S. Herzog
Snow Becker Krauss, P.C.
605 Third Avenue
New York, New York 10158

Jennifer Rubin
Sutherland, Asbil & Brennan, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309

Dated:  Brooklyn, New York
        March 20, 2006

*/s/Sharon L. Weiss*
Sharon L. Weiss